# CHARLESTON.

BALTIMORE & OHIO R. R. CO. V. PUBLIC SERVICE
COMMISSION.

Submitted November 27, 1917.  Decided December 4, 1917.

1. PUBLIC   SERVICE   COMMISSIONS—*Discriminatory   Regulations—Powers of Commission.*

   The Public Service Commission Act does not deny to public service corporations the common law right to make regulations, nor vest such power in the Public Service Commission, in the first instance, but said Commission may, on finding such regulations unjust, unreasonable, insufficient or unjustly discriminatory, annul them and substitute others for them.  (p. 460).

2. SAME—*Regulations—Authority of Public Service Commission.*

   If a regulation prescribed by such corporation is just, reasonable and fair, under all the circumstances, the Commission is without authority to annul it, even though it is discriminatory, if the discrimination it makes is not unjust and rests upon a classification of subjects based upon substantial differences in situation and circumstances.  (p. 460).

3. RAILROADS—*Furnishing Cars—Order of Commission—Review.*

   An order of the Public Service Commission setting aside a regulation of a railroad company, .classifying shippers for the purpose of distribution of freight cars for coal shipments, on an occasion of an immense shortage in such cars, is reviewable on the question of the reasonableness of the regulation and the character of the discrimination it makes.  (p. 460).

4. SAME—*Railroad Regulation—Cars for Coal Shipment.*

   In view of a great shortage of cars suitable for coal shipments, . occasioned by extraordinary conditions bringing into temporary

activity a great many mines that are not equipped with tipples for loading cars, but demand *pro rata* allotments to them of open top cars for their shipments, which cannot be furnished without serious detriment to permanent and properly equipped mines, the carrier and the general public, a railroad company of which such allotments and distributions are demanded may, by promulgation of a regulation applicable to all such mines, assign its open top cars to the permanent and properly equipped mines and box cars to those loading without tipples and from wagons and trucks. Such a regulation, under such · circumstances, is neither unreasonable nor unjustly discriminatory.   (p. 460).

5.   SAME—*Equal Transportation Facilities—Coal Shipments—Statute.*
        In so far as sec. 66c of ch. 54, Code of 1916, contemplates equality of transportation facilities among shippers of coal, in point of mere convenience, not reasonable means of transportation within the ability of the carrier, it applies only to mining industries having efficient and usual equipment for loading coal cars.   (p. 463).

6.   CONSTITUTIONAL LAW—*Impairment of Obligation of Contract.*
        Successful impeachment of an order of the Public Service Commission, requiring a railroad company to furnish coal cars at sidings privately owned, for the use of persons other than the owners, with the consent of the owners, on the ground that it impairs the obligations of contracts between it and such owners inhibiting such use without the consent of both parties thereto, requires proof of lack of reasonable necessity for such use, the order having been made on some evidence of occasion therefor.   (p. 463).

7.   SAME—*Impairment of Obligation of Contract—Contracts of Public Service Corporations.*
        In so far as the contracts of public service corporations conflict with public duties imposed upon them by law, they are not within the protection of the constitutional provision inhibiting impairment of the obligations of contracts.   (p. 463).

Application by the Baltimore & Ohio Railroad Company for the annulment or suspension of orders of the Public Service Commission requiring applicant to desist from its practice as to distribution of cars for interstate coal shipments.

*Order of Public Service Commission suspended in part.*
*Conley & Johnson,* for petitioner.
S. B. Avis, for respondent.

POFFENBARGER, JUDGE:

This is an informal application authorized by statute, for annulment of an order of the Public Service Commission, requiring the Baltimore and Ohio Railroad Company, an interstate and intrastate carrier of passengers and freight, to desist from a practice relating to distribution or allotment of cars for intrastate shipments of coal, which, in the opinion of the Commission, works an unjust and unreasonable discrimination against the miners and shippers of coal, on whose complaints the order was made, and all other persons and corporations similarly situated.

The character of the numerous complaints inducing the procedure and the scope and effect of the action of the Commission are indicated by the order in question, which reads as follows:

"The Commission is of opinion to and doth order as follows:"

"First: That the Baltimore & Ohio Railroad Company, a corporation, do forthwith cease and desist from its practice of furnishing to team track loaders, i. e. persons engaged in loading coal from wagons and motor trucks, railroad box cars exclusively for intrastate shipment and commerce; and that said Railroad Company do furnish to said team track loaders for intrastate shipment and commerce the same percentage of open top gondola or hopper cars, to which they are entitled under their allotment, as it furnishes to tipple loaders, i. e. to persons engaged in loading coal on railroad cars from tipples or other structures of like character, for intrastate shipment and commerce."

"Second: That the said The Baltimore & Ohio Railroad Company be, and it is hereby required, to furnish said team track loaders, for the purpose of loading coal for intrastate shipment and commerce, the same percentage of the allotment of cars to which they are entitled, as it shall furnish to persons engaged in loading coal from tipples or other structures of like character, for intrastate shipment and commerce."

"Third: The said The Baltimore & Ohio Railroad Company is not required to furnish team track loaders with cars

of any character upon private sidings connected with said railroad, unless said sidings shall be owned by said team track loaders, or said team track loaders shall have the consent of the owners thereof to use the same.''

Admitting the discrimination complained of, the railroad company endeavored to justify it in law, before the Commission, on several grounds. · Right to assign the open top cars known as gondola and hopper cars, to mines loading their coal from tipples, and box cars to mines loading by means of wagons and trucks, in view of the inconvenience attendant upon the loading of the latter class from tipples, causing delay in shipments, and the relative unimportance of the production and shipments from team track mines, is claimed on the ground of public necessity for exercise of the carrier's maximum powers and capacity for the handling of coal, under the extraordinary conditions' prevailing throughout the country and especially in the sections dependent upon water transportation through the Great Lakes, which was delayed by the backward season and will be terminated by the approaching winter, when coal is needed worst.

From Nov., 1916 to June, 1917; inclusive, 137,869 cars were loaded at tipple mines; and 2,597, at wagon and truck loading mines, on two divisions of the road, the Mononga and the Cumberland. In the first month of that period, only .55% of the cars were loaded at mines of the latter class, on those divisions, and 4.33% in the last month. The unusual demand for coal and consequent high prices thereof have evidently occasioned a large relative increase in the out-put of· wagon loading mines, but more than 95% of the coal shipped by rail came from tipple loading mines in June, 1917, nevertheless, wherefore it is apparent that facilitation of the transportation of the production of these mines more nearly approximates fulfillment of the fuel requirements of the general public, than would ·expeditious handling of the out-put of the other mines.

Box cars are inconvenient and unsuitable for both classes of shippers, and their use for coal shipment entails losses or burdens in both time and expense. But the extraordinary

transportation requirements exceed the ability of the car-. riers to furnish open top cars and denial thereof to the wagon loading mines, or substitution of box cars therefor at such mines, inflicts less injury upon the general public than would denial thereof to the other class of mines. In other words, the public interests are best subserved by the carrier in the use of its most suitable coal cars at the mines producing the larger quantities of coal and loading the cars in the most expeditious manner. A tipple loading mine loads an open top car in a few minutes while a wagon loading mine seldom or never loads one in less than a day. A box car cannot be loaded by means of an ordinary tipple, and the coal loaded from wagons must be handled with shovels, whatever the character of the car may be.

This contention is not reduced or referred to any defined legal principle. There is no claim of right to discriminate between classes of shippers, in the manner complained of, on account of an extraordinary demand for coal within the state, exceeding the capacity of the carrier to supply it, without discrimination. The business of the railroad company is carriage for shippers rather than provision for what it may deem public exigencies. Legally and theoretically it is the servant of all shippers on its lines. By its service for them, it promotes the public welfare, wherefore its service to them is its primary duty and its contribution to the general welfare, though highly important, is a mere incident of such service. Avoidance of its duty to a shipper or a class of shippers, as a means of promotion of·what it may conceive to be advantageous to the general public, would be an assumption *pro tanto* of a status variant from that which it legally occupies, and its inability to effect such a change or alteration of its character and function, without legislative authority, is obvious.

In so far as its business and functions are purely intrastate, the Baltimore and Ohio Railroad Company has the same rights, powers and privileges, and is subject to the same liabilities, as a railroad company organized under the laws of this state and operating a railroad wholly within its territorial limits. Code, ch. 54, sec. 30; *Allen* v. *Baltimore*

& Ohio R. Co., 58 W. Va. 388. As to such business and functions, it is, therefore, subject to the regulatory powers of this state and its laws, including the statute vesting power and authority in the Public Service Commission to prohibit unjust discrimination on its part, between shippers. In giving this power to the Commission, the legislature has impliedly declared such discrimination unlawful and neither the railroad company nor the Commission can legalize it, however great the public necessity therefor may seem to be under peculiar circumstances. An exception from the operation of general laws, or suspension thereof, on occasions of public exigency, and merely on account thereof, if constitutional, would have to be provided for by the legislature.

Some of the facts relied upon in support of this untenable view, however, may constitute ground for successful impeachment of the order, under the incontrovertible right of the railroad company and all other public service corporations, recognized by the state law, to discriminate reasonably and justly between classes of patrons and kinds of business, on account of substantial differences in point of character. This right, when available, is a limitation upon the powers of the Public Service Commission. United Fuel Gas Co. v. Public Service Commission, 73 W. Va. 593. It is firmly asserted and well defined in Elk Hotel Co. v. United Fuel Gas Co., 75 W. Va. 200. Since the date of the former of these decisions, the Public Service Commission Act has been amended, but it still permits just discrimination, for the Commission is authorized to change only unjust, unreasonable, insufficient and unjustly discriminatory "regulations, measurements, practices, acts and service." Code, 1916, ch. 150, sec. 23. As amended, it does not clothe the Commission with unlimited power over the subject of classification. Just, reasonable and fair discrimination is still recognized and contemplated by the law. The order complained of abrogates a regulation or order of the railroad company, by which it has classified shippers of coal with reference to their methods of loading, the commercial qualities of their coal, the relative quantities produced, the stability and permanence of their business and other facts, including the extra-

ordinary demands upon its transportation facilities, restricting its ability to afford all shippers the most convenient, efficient and desirable service.

For express inhibition of the classification set aside by the Commission, a clause of sec. 66c, ch. 54, Code, 1916, is relied upon. It says: "Every railroad corporation along whose line of railroad the industries of mining coal or manufacturing coke is carried on, shall without discrimination between or amongst shippers, and without unnecessary delay, make a reasonable provision for the transportation of all such coal and coke offered for transportation over its railroad, and no such railroad corporation shall discriminate in rates, distribution of cars or otherwise against or among shippers of coal or coke offered for shipment on its line or lines." It contemplates mining industries and the terms should be applied, and the provision enforced, in the sense in which the language was used. The legislation was invoked to prevent discrimination between and among persons, firms and corporations regularly engaged in the industry and operating mines properly equipped for loading coal, to compel reasonable provision for transportation of coal from such mines. The section deals with mining industries, and requires impartial provision of facilities for them, but it cannot be fairly interpreted as requiring equal facilities to persons not regularly engaged in coal mining, nor having the usual and ordinary mining equipment. Its purpose was to promote and encourage efficient coal mining and transportation, not to embarrass or hamper them.

Until the late fall of 1916, the team track loading mines constituted a negligible quantity in the mining and shipment of coal. Since that time, the extreme demand for coal and phenomenally high prices have brought hundreds of them into existence, each one producing only small quantities and all, less than 5% of the total shipments, in June, 1917. Under normal conditions, they could not profitably operate at all, and, when such conditions are restored, their production will no doubt cease. For this reason, railroad managers have denominated them "Snow Bird" mines or shippers. Ordinarily, they do not load more than one car a day. They

add nothing to the available supply of coal, for the regularly equipped mines are able to produce more than the carriers can transport. Less than sixty per cent. of the cars demanded for coal transportation can be supplied, on account of a shortage of cars. The time consumed in the loading of cars by teams delays deliveries. Generally they keep each car assigned to them an entire day and often longer, when it could be loaded elsewhere in a few minutes. Cars placed on side tracks for team loading often have to be shifted off of them and back again, before the loading is completed, in the use of the sidings for other purposes. This involves loss of time of engines and crews, needed in the handling of cars for mines that would load perhaps fifty while they load one. These indisputable facts prove the operation of the team track loading mines retards and limits transportation, to the detriment of properly equipped mines, the carrier and the general public.

At none of the regularly equipped mines, except a few having box car loaders, can box cars be used without infliction of great delay and confusion. One large operating company on the Mononga division operates box car loaders at about six of its twenty-three mines. Generally, the permanent mines are equipped for tipple loading only and the use of open top cars. Manifestly, the inconvenience, expense and loss of time in the use of box cars at these mines greatly exceed those incident to their use at team track mines. Many of them are immense industries, equipped with mining machinery, such as cutting machines, electric haulage and screening and sorting apparatus, and employing hundreds of men. Delay to such enterprises works great public injury, while that occasioned to team track mines employing a dozen or fewer poorly equipped miners is slight and comparatively inconsequential. Besides, box cars can be used more advantageously, or with less inconvenience, at side tracks in the open country than at tipple mines. These facts make it apparent that the railroad company's classification is founded upon real and substantial differences and puts each class of cars in that branch of transportation in which it can be

most efficiently employed, but, in doing so denies the team track loaders the more convenient and desirable class.

They are not denied shipping facilities nor the right to operate their mines and dispose of their products in the market. They are merely subjected to a discrimination respecting the quality of the service afforded them, on account of the character of their shipments. In the infliction of this discrimination, the carrier cannot be said to have made a distinction without a difference. The difference in situation and circumstances is marked, obvious and radical. Like every other business, that of mining, transportation and sale of coal, considered as a whole, has acquired, under normal conditions, qualities and characteristics, developed principles and brought into existence conditions, that cannot be instantaneously altered, for the accommodation of persons desiring the temporary introduction and maintenance of new qualities, principles, methods and conditions, without a disastrous dislocation and disturbance of those previously fixed and settled by long experience, vast expenditures of money and the exercise of the highest degree of skill and efficiency. Mining and coal transportation are closely allied industries. Mines are opened and equipped with reference to railroads and railroads built, equipped and operated with reference to the mines and coal markets and terminal requirements and facilities.

The complainants at whose instance the Commission order was made are not equipped for the production and shipment of coal, in the manner in which that business is generally conducted, nor do they contemplate such equipment. Their methods do not harmonize or correspond with existing and firmly established conditions. Nevertheless, they demand, as of right, a service and facilities in all respects equal to those afforded properly equipped mines having an established and permanent business, even though compliance with their demand involves disarrangement and impairment of a complex system upon which the efficient operations and functions of two or three great industries vital to the public welfare depend, and the introduction of chaotic conditions in mining, transportation, manufacturing and domestic life,

All of this is proposed, sought and demanded as a means of obtaining mere personal and individual gains, for, as has been observed, these operators embarrass rather than aid the effort to meet the public demand for coal. Their purpose is not tainted with any illegality, immorality or other impurity, and they are entitled to transportation facilities; but they cannot have the best and most convenient facilities for their purposes, under existing conditions, without great injustice to the carriers, the properly equipped mines and the public. Their own lack of proper equipment is a just and reasonable ground of discrimination against them, when conditions are such as to make an extension of equality of facilities to them highly injurious to others and restrictive of the efficiency of the carriers. If their areas of coal are too small, or their means too limited, or the prospect of profit on the restoration of normal conditions too doubtful, to justify their installation of proper equipment, that is their misfortune. Thousands of other citizens are in worse condition than they. Vast areas of coal are so situated that their owners cannot avail themselves of present market conditions at all. The right of the complainants to engage in the coal business and reap rewards therefrom is not questioned nor denied. It is conceded, and so is their right to have their coal transported, but they have no absolute right to equality with other producers and shippers differently situated and operating in a way different from theirs, when it cannot be accorded without the infliction of palpable injustice.

Another circumstance to be noticed and accorded considerable weight is the meagerness of the intrastate coal business, the order in question is supposed to conserve and protect. Of the 153 cars reported to have been shipped by a number of the complainants, only two went to intrastate destinations, without having passed through the State of Maryland, and three went to points in this state by transportation, in part, over Maryland territory. The great bulk of their business seems to be interstate. If their intrastate business is not to be increased, the order complained of will be practically ineffective for either good or evil. But the ruling of

the Commission may afford the means of gaining a business not already possessed, with the incidental detriment to which reference has been made, and, besides, the complainants are the movers and their charge of unjust discrimination ought to have a substantial basis. They can suffer no such injury by discrimination, in respect of a business in which they are not substantially engaged, as justifies an order requiring rearrangement or disarrangement of great transportation systems upon which the public welfare is dependent.

No doubt the power of the Commission to pass upon the reasonableness and fairness of the regulations, practices, acts and service of public service corporations, is administrative, but it is not an unlimited nor unrestricted power, whatever its legal and technical character may be. It may set aside unreasonable and unjust regulations and establish reasonable and just ones in lieu thereof. This is the extent of the authority conferred by the letter of the statute and there is no warrant in law for an extension thereof. The public service agencies have the right of initiation and, unless the measures they adopt fall within the condemnatory provisions of the act, they cannot be abrogated. Authority to annul unreasonable and unjust discriminatory regulations and substitute reasonable and just measures for them, is not authority to disturb them when they are reasonable, just and legal. *Chesapeake & Ohio Ry. Co.* v. *Public Service Commission,* 78 W. Va. 667, 89 S. E. 844; *Interstate Commerce Commission* v. *Union Pacific R. Co.,* 222 U. S. 541; *Illinois Cent. R. Co.* v. *Interstate Commerce Commission,* 206 U. S. 441. When the order of a commission is based upon facts establishing injustice, sustained by evidence, or found from conflicting evidence, it cannot be disturbed, because the courts will not review the findings as to the facts. But, if the facts are undisputed and the reason and justice of the case is clear and plain, an order made in contravention thereof has no foundation in law, and is not beyond the power of judicial abrogation. This is the obvious meaning of the language found in the opinion in *Houstan & Texas Ry. Co.* v. *United States,* 234 U. S. 358, saying "And the question whether the carrier, in such a case, was giving undue or unreasonable preference

or advantage" etc. "would be primarily for the investigation and determination of the Interstate Commerce Commission and not for the courts." The commission, not the courts, acts first. The question involved in Mitchell v. Penna. R. Co., 230 U. S. 304, pertained to rates, and the rate making power, when the exercise thereof does not inflict discrimination, stands upon a footing entirely different from that of traffic regulations and practices. The Public Service Commission Act of this state confers much broader powers as to rates than it does as to regulations. In the latter class of cases, the Commission must have proof of injustice, unreasonableness, unjust discrimination, or the like, as the basis of its power of alteration.

The last clause or provision of the order is assailed on the ground that it impairs the obligations of contracts between the railroad company and the owners of private sidings, one provision of these contracts being that no person other than the owners may use them without the consent of both the owner and the railroad company. In so far as these contracts stand in the way of duty the railroad company owes to the public, they are not within the protection of the constitutional guaranty invoked. Benwood v. Public Service Commission, 75 W. Va. 127. Railroad companies are bound to make reasonable provision for all shippers and this includes allowance of side-track connections. State ex rel v. White Oak Fuel Co., 65 W. Va. 15. Nothing is relied upon here in resistance of this part of the order, except the bare contracts. The railroad company has adduced no evidence tending to disprove necessity or justification of requirement of the use of these side-tracks, as reasonable provisions for shippers. The Commission had before it some evidence of such necessity. It appeared that there was a public demand for their use in the loading and shipment of coal, and it is not even suggested here that the demand was insufficient to justify this provision of the order, or, in other words, that it is unreasonable. The order is not necessarily a permanent provision of universal application, and, if it should prove to be harsh and unreasonable in any particular case, the Com-

mission has power to modify it, and will no doubt do so upon a proper request for relief in such case.

For the reasons here stated, the first and second paragraphs of the order complained of will be suspended, set aside and annulled.

*Order of Public Service Commission suspended in part.*