Eureka Pipe Line Company, *et al.*

*v.*

The Public Service Commission of West Virginia, *et al.*

(No. 12313)

Submitted May 19, 1964.          Decided June 30, 1964.

*Charles E. Anderson, Robert B. McDougle* and *John R. Morris,* for petitioner Eureka Pipe Line Co.

*T. D. Kauffelt,* for intervenors below—Independent Oil & Gas Ass'n. of W. Va. and J and B Oil Co.

*Charles C. Wise, Jr.,* and *Robert E. Magnuson, Charles E. McGinnis,* Pittsburgh, Pa., for Pennzoil Co.

*Robert L. Stewart,* for respondents The Public Service Commission of W. Va.

*Spilman, Thomas, Battle & Klostermeyer, Howard R. Klostermeyer, R. Page Henley, Jr.,* for protestant Devonian Gas and Oil Co.

CALHOUN, JUDGE:

This case is before the Court for review of a final order entered by the Public Service Commission of West Virginia on November 22, 1963, which rejected and struck from the files of the commission a proposed tariff submitted by Eureka Pipe Line Company (which will be referred to in this opinion as Eureka), which proposal embodied new and additional rules and regulations for the conduct of Eureka's business. The proposed amendment of an existing tariff was rejected by the commission on the ground that, because of the provisions of Code, 1931, 22-5-2, Eureka had no authority to make the proposed rules and regulations and the commission has no jurisdiction or power to confer such authority. The effect of the order is to hold that the commission, under the law of this state, has no jurisdiction, power or authority to act upon such proposed rules and regulations.

Eureka is a public utility which has been in the business of transporting petroleum by pipeline since before the turn of the present century. Its intrastate operations have been subject to the jurisdiction and control of the public service commission since that regulatory body was created by statute in 1913. Eureka's principal pipeline extends from a point in Kanawha County northward to the Pennsylvania-West Virginia state line in Monongalia

County. From that line a spur or branch pipeline leads from Braden, Tyler County, westward to the Ohio River. This branch line receives and transports oil produced in the State of Ohio. The balance of the oil transported by Eureka is produced by wells located in West Virginia. In addition to the pipelines referred to above, Eureka has about 2,000 miles of feeder lines in West Virginia to gather petroleum from the wells and to carry it to the main transportation lines.

The petroleum transported by Eureka is a distinct type and of prime quality, known as Pennsylvania-grade crude oil. It is produced only in Ohio, New York, Pennsylvania and West Virginia; but at this time more of it is produced in West Virginia than in any other state. There are but ten refineries by which this oil is processed. Two of them are in West Virginia and eight are in Pennsylvania. The market for the petroleum is, therefore, limited by the volume thereof which is received and processed by the ten refineries. Eureka's pipeline facilities are far more than adequate to receive and transport all the petroleum for which there is a market.

For years Eureka has had and now continues to have a provision in its tariff giving it the right to refuse to take oil for transportation unless the shipper has provided the necessary facilities for receiving the oil as it arrives at its destination.

In recent years, the volume of production of oil in West Virginia has increased to such an extent that it, coupled with the oil coming from Ohio, is considerably in excess of the volume which the ten refineries can receive and process. This situation created a crisis which has given rise to the case presented for decision. Eureka is merely a transportation utility. It has no storage facilities other than such as are incidental to its primary business of transporting. The refineries have no storage facilities other than such limited storage facilities as are incidental to their business of processing the crude oil delivered to them.

As a consequence of the crisis created by the excess of the volume of production over the volume of oil for which there is a market, Eureka and the independent producers of oil in this state undertook a cooperative effort to find a satisfactory solution to the problem presented. A study group was formed and the services of a petroleum expert were engaged. The rules and regulations embodied in the proposed amendment of the existing tariff were formulated as a result of the cooperative effort and study.

Hearings were had before the public service commission at which Eureka and the intervenors produced testimony, supplemented by exhibits, to establish the reasonableness and propriety of the rules and regulations. Devonian Gas and Oil Company (which will be referred to in this opinion as Devonian) appeared as the sole protestant and participated in the hearings before the commission. Devonian offered no testimony before the commission to establish that the proposed rules and regulations are unreasonable or discriminatory. It simply takes the position that they cannot lawfully be approved by the commission. The final order entered by the commission states that a previous practice of Eureka in allocating its transportation facilities among the producers "may have performed a useful and even laudable function,— but nevertheless we can find no authority for it in the law."

The commission did not undertake to determine whether the rules are unjust, unreasonable or unjustly discriminatory. It merely decided that it had no jurisdiction and no legal power or authority to consider the rules. There is no substantial dispute concerning the pertinent facts. The order of the commission, therefore, is not one based on a finding of fact but rather it is based on the commission's understanding and interpretation of applicable law.

The proposed amendment of Eureka's existing tariff divides oil wells into three categories for the purposes of the proposed tariff. Stripper wells are classified as wells which produce monthly no more than ninety barrels of oil each or three barrels a day. Secondary recovery wells

are those involving the production of oil by artificial means, such as gas injection or water flooding. The wells in the third category are, generally speaking, the newer wells with a high production capacity.

During the early months of 1963, there were 11,658 stripper wells. That total includes approximately 1,800 secondary recovery wells which have an average daily production of less than one barrel each. During the same period in 1963, there were 488 wells in the third category having a monthly production in excess of ninety barrels each. The 488 wells produced 50.42% of the oil, while the remainder was produced by the 11,658 wells in the stripper category. Devonian, the sole protestant, has a total of ten wells. Three of the ten are stripper wells.

The rules and regulations contained in the proposed tariff are as follows:

"(a) This company will first accept for transportation from each stripper well served by its system that quantity of oil produced and purchased equal to ninety (90) barrels per month, or so much of said quantity as said well shall produce.

"(b) It will then accept for transportation that quantity of oil produced and purchased from leases operated in a program of secondary recovery or pressure maintenance by means of gas injection, water flood or other method, up to a total equal to the maximum rate per well established for this company's system as hereinafter provided, times the number of wells being actively operated in such a program. This company will accept an amount in excess of the maximum established rate only when it is demonstrated that such restriction will reduce the ultimate recovery of said project.

"(c) It will then accept for transportation the remaining oil produced and for which there are purchasers available from all wells served by its system capable of producing such oil to a maximum monthly limit per well which will be determined monthly for the system, as hereinafter provided, and may vary from month to month. This

production will be ratably taken from all such wells capable of producing above the maximum rate.

"(d) Any determinations required to be made under these regulations will be made on the basis of data and information available to this company from producers, purchasers and other sources considered reliable. This company will not be held responsible to any person or company for any such determination made in good faith on the basis of such information. This company will give careful attention to data and information provided it by producers, purchasers and their representatives and this company will operate under these regulations in a manner fair and equitable to all interested parties and without discrimination."

After quoting the provisions of Code, 1931, 22-5-2, the public service commission made the following statements in its order:

"The Commission believes that under the law as above quoted it is Eureka's duty to accept for transport and delivery to the consignees all oil that is offered for transport (in quantities provided by statute).          *   *   *

"The tariff sheet quoted above would clothe Eureka with authority to determine which producer could and which could not sell his oil. We believe that Eureka should have no such authority and that this Commission would, therefore, transcend its regulatory powers if it attempted to confer such authority. *  *  *"

The brief of counsel filed in behalf of the commission asserts that the proposal represents an attempt by Eureka "to allocate or prorate the available market or to say, in effect, how much oil shall be produced by whom."

The brief filed in behalf of Devonian asserts that Eureka is undertaking to regulate the production of oil in West Virginia and "is attempting to exercise the police power of the State of West Virginia to conserve its natural resources—a power residing only in the Legisla-

ture of the state." The Devonian brief apparently assumes that the legislature could do what Eureka is undertaking to do by means of the proposed rules and regulations. The brief asserts that various other states have statutes of that nature. It asserts that when "the market becomes saturated, Eureka may have to close down its facilities temporarily." Much of the Devonian brief is devoted to the proposition that the proposed tariff is unfair, unreasonable and "unjustly discriminatory." It also asserts that the proposal provides for no standards or guides which could be applied by the commission and that it provides for no supervision by the commission of factual determinations which might be made by Eureka under the proposed tariff.

In opposition to the arguments urged in behalf of the commission and in behalf of Devonian, briefs and oral arguments in behalf of Eureka and the several intervenors assert that the proposed rules and regulations do not undertake to regulate the production or marketing of oil, though such may to a degree be an incidental or secondary effect of the primary purpose to allocate Eureka's transportation facilities among producers on a fair and equitable basis; that, if the proposed tariff were made effective, the commission would have the right and authority to modify or amend it at any time; that the testimony discloses that, if the wells producing less than three barrels a day were closed down temporarily, production from many of them could never thereafter be resumed and that their potential production would be lost forever; that the proposed tariff would not regulate or lessen the overall or total production of oil in West Virginia but, on the contrary, if the proposed tariff were made effective, the overall or total production of oil would continue to be determined by the demands of the ten refineries; that the commission failed to interpret properly the provisions of Code, 1931, 22-5-2; that Eureka, as a public utility, has the right, by statute and common law, to make reasonable rules and regulations for the conduct of its business; and that the rules and regulations proposed by Eureka are lawful and are neither

unreasonable nor unduly discriminatory. Eureka and the intervenors do not contend that the commission has jurisdiction or authority merely to regulate either the production or marketing of oil.

The statute on which the order of the commission is based has remained unchanged from 1891 until the present time and is as follows:

> "Any company heretofore or hereafter organized for the purpose of transporting petroleum or other oils or liquids by means of pipe line or lines shall be required to accept all petroleum offered to it in merchantable order in quantities of not less than two thousand gallons at the wells where the same is produced, making at its own expense all necessary connections with the tanks or receptacles containing such petroleum, and to transport and deliver the same at any delivery station, within or without the State, on the route of its line of pipes, which may be designated by the owners of the petroleum so offered."

Eureka and the intervenors contend that the commission, in considering the statute, unduly emphasized the words, "shall be required to accept all petroleum offered to it," to the exclusion of the words, "and to transport and deliver the same at any delivery station, * * * on the route of its line of pipes, which may be designated by the owners of the petroleum so offered." They contend also that the commission erred in not applying the statute as this Court applied a statute in a similar or analogous situation in *Baltimore & Ohio R. R. Co.* v. *Public Service Commission*, 81 W. Va. 457, 94 S. E. 545. That case arose during wartime in 1917 when there was an unprecedented demand or market for coal. Many small mines, known as "snowbird mines", came into operation because of the prevailing high market price of coal. The larger mines were equipped with tipples or similar facilities for loading coal directly into open-top railroad cars known as gondola or hopper cars, while coal from the smaller mines was loaded into railroad cars by hand.

In the circumstances stated above, the railroad company made rules and regulations which allotted all avail-

able open-top cars to the larger mines which were equipped with tipples or other loading facilities of a similar nature. Box cars only were allotted to the smaller mines. The public service commission held that such rules and regulations resulted in an unjust and unreasonable discrimination against the operators of the smaller mines and the miners employed at such mines; and entered an order requiring the railroad company to desist from such discrimination. Upon appeal, this Court reversed and annulled the order of the commission. Both the Court and the commission were faced with a statute which now appears as Code, 1931, 31-2-5, and which requires every railroad corporation, along whose lines the industry of mining coal is carried on, to transport coal without discrimination among shippers and without discrimination in the distribution of railroad cars among shippers of coal. Perhaps the vital portion of the opinion, the portion most pertinent to the present case, is summarized in the second point of the syllabus, which is as follows: "If a regulation prescribed by such corporation is just, reasonable and fair, under all the circumstances, the Commission is without authority to annul it, even though it is discriminatory, if the discrimination it makes is not unjust and rests upon a classification of subjects based upon substantial differences in situation and circumstances." We have studied carefully the opinion in that case. In that study we have been greatly aided by the careful analysis made of it by briefs and oral arguments of the very able counsel for the respective parties. We do not consider that case as a direct or controlling precedent for the present case.

The public service commission is a creature of statute. It has no jurisdiction and no power or authority except as conferred by statute. *City of Bluefield* v. *Public Service Commission*, 94 W. Va. 334, pt. 1 syl., 118 S. E. 542. It has no inherent jurisdiction, power or authority. *City of Norfolk* v. *Virginia Electric and Power Co.*, 197 Va. 505, 514, 90 S. E. 2d 140, 146; *Clifton Forge-Waynesburg Telephone Co.* v. *Commonwealth*, 165 Va. 38, 43, 181 S. E. 439, 441; 73 C.J.S., Public Utilities, Section 38, page 1064. "* *

*A public service commission has, however, no inherent power; all its power and jurisdiction, and the nature and extent of the same, must be found within the statutory or constitutional provisions creating it." 43 Am. Jur., Public Utilities and Services, Section 193, page 701.

Code, 1931, 24-2-1, as amended, provides: "The jurisdiction of the commission shall extend to all public utilities in this State, * * *." The same section of the Code proceeds to enumerate various public services over which the commission's jurisdiction extends. Quite clearly the public service commission would transcend its statutory jurisdiction, power and authority if it should undertake to exercise control over business enterprises not falling within the classification of public utilities. Admittedly, Devonian and the other producers of oil involved in this case are not public utilities and, therefore, they are not within the jurisdiction of the public service commission.

In *Baltimore & Ohio R. R. Co.* v. *Public Service Commission,* 81 W. Va. 457, 94 S. E. 545, to which reference was made previously in this opinion, the problem presented was one directly involving the facilities of the carrier. The carrier did not undertake by rules and regulations to take one hundred percent of the coal produced by some mines and a lesser percentage of the coal produced by other mines. The problem was not one involving the coal industry itself except to the extent that the coal industry was faced with a problem caused by the limitation upon the transportation facilities of the carrier. The problem arose directly from the limited facilities of the public utility which was involved in that case. Any possible alleviation of that problem necessarily involved some sort of regulation of the available transportation facilities of the carrier. That case presented the very converse of the problem presented in this case. That is to say, the operators of mines were producing more coal and the market demanded more coal than the carrier could transport. The bottleneck was created directly by the facilities of the carrier. In the present case, the problem is not caused by the facilities of Eureka, the carrier. Its facilities are adequate to transport far more than the

market demands, far more than the producers can sell. Perhaps it is fair and accurate to say that the problem in the present case has been caused by overproduction by the producers.

Another distinguishing feature is the fact that in the railroad case this Court laid much stress upon the problem as it related to the rights and demands of the public. In the present case, Eureka, the carrier, is able to transport far more oil than public interests demand. There is nothing connected with Eureka's transportation facilities which imposes any sort of hardship upon the public or even upon the purchasers or users of oil.

In final analysis, we believe, the problem presented in this case is not one directly related to the facilities or services of a public utility, but rather it is a problem affecting the oil producing industry as such in this state. It arises from the simple fact that production of oil exceeds the demands of the market. That problem does not arise from or directly affect the operation of Eureka's business as a public carrier of oil. Eureka will continue to transport all the oil which is marketed. In any event, the volume of oil available to it for transportation will continue to be limited by the demands of the ten refineries. No regulation of the transportation facilities of Eureka can conceivably affect materially or alleviate the basic problem created by the excess production of oil over the demands of the market.

We believe, therefore, and accordingly the Court holds that this case presents an effort to solve a problem facing the oil production industry through the medium of rules and regulations embodied in a proposed tariff of a public utility engaged in the mere transportation of oil. The public service commission has no jurisdiction and no legal right or power through this or any other medium to regulate the production or marketing of oil in this state; and, therefore, it has no jurisdiction and no legal right or power to approve the proposed tariff.

For reasons stated, the order of the public service commission is affirmed.

*Affirmed.*