328 S.E.2d 356

**W. VA. PUBLIC EMPLOYEES INSURANCE BOARD**

v.

**BLUE CROSS HOSPITAL SERVICE INCORPORATED, a corporation, and Blue Shield of Southern West Virginia, Incorporated, a corporation, and Health Service, Incorporated, a corporation.**

No. 16094.

Supreme Court of Appeals of West Virginia.

March 22, 1985.

Dissenting Opinion March 25, 1985.

Cletus B. Hanley, Charleston, for appellant.

M. Blane Michael and W.T. Shaffer, Jackson, Kelly, Holt & O'Farrell, Charleston, for Blue Cross.

Frederick L. Thomas, Jr., and George G. Guthrie, Spilman, Thomas, Battle & Klostermeyer, Charleston, for Health Service.

Philip S. Neal; Emmett B. Lewis, Joanne Thomas Asbill, Washington, D.C., for appellees.

BROTHERTON, Justice:

On August 25, 1972, the West Virginia Public Employees Insurance Board ("Board") distributed a letter inviting all interested parties to submit bids for life and health insurance coverage of West Virginia public employees. Enclosed with the invitation letter was a copy of the specifications upon which the insurance plan bids were to be based. Blue Cross and Blue Shield ("Blue Cross") was a recipient of the letter and presented its bid to the Board. As a part of the bidding process Blue Cross answered a comprehensive set of questions, hereinafter referred to as "specifications," regarding various aspects of the potential insurance contract. An important part of these questions and answers is set out below:

V. DISCONTINUANCE OF PLAN.

A. Question: In the event of the termination of the group policies, would your company make a final accounting of premiums and claims, and return any surplus to the policy holder?

Answer: Yes, if the contract is terminated by Blue Cross. No, if the contract is terminated by the Public Employees Insurance Board.

B. Question: Is a final accounting contingent upon termination of the policy on the policy anniversary?

Answer: Yes.

The "surplus" in question A was computed in the following manner. The State would pay Blue Cross a certain "charge" every year.[1] Out of this charge Blue Cross would pay the claims against the policy, and be entitled to keep a "retention amount" equal to 5.75% of the total charge. This amount represented the gross profit to Blue Cross, and included costs for claims administration, a risk charge, and other expenses. What was left over after the incurred claims and the retention amount was considered the surplus.

The Board awarded the health insurance contract to Blue Cross, which in return issued Group Contract No. 2222 to the Board on November 1, 1972. On the same day, Health Service, Inc. contracted with Blue Cross to reinsure 50% of their liability and to share in 50% of the costs of the contract in return for a percentage share of the earned premiums.

On June 30, 1973, the surplus amount for the prior year was $2,723,458.95. This amount was credited to the Board after the Board renewed the policy. On June 30, 1974, the surplus amount increased to $5,276,672.65. This amount again was credited to the Board after the Board renewed the policy.

In early 1974 the Board was considering an Administrative Services Only ("A.S.O.")

---

1. The term "premium" was conspicuously avoided. Blue Cross noted, however, that "charge" is a term that Blue Cross has developed over the years and its use instead of "premium" has no significance.

method of insurance coverage to reduce the costs of providing coverage to State employees. In December, 1974, the Board approved an A.S.O. contract with Equitable Life Assurance Co. The Board officially notified Blue Cross on February 28, 1975, of its decision to terminate the Blue Cross contract effective April 1, 1975. On April 1, 1975, the surplus was $6,414,190.51 (despite having had only nine months to accumulate). After subtracting $347,855.15 due to an insufficient reserve on the termination of the policy, this left a net surplus of $6,066,335.36, which is the subject of this litigation. The Board, seeking the return of $6,066,335.36 in surplus charges paid to the appellees, filed suit in the Circuit Court of Kanawha County. On November 8, 1983, the circuit court entered a summary judgment in favor of Blue Cross. The Board appeals to this Court.

■■■■■ Before we can construe the contract involved in this case, we must first determine whether the specifications are a part of the contract. The Board vigorously insists that the questions and answers in the specifications were not a part of the contract.[2] We need not make a sweeping statement of law as to whether the specifications put out on a proposal for public bid become a part of the final contract, as it is clear from the actions of the parties in this case that these specifications were considered a part of this contract. The specifications contained several essential terms of the agreement between the parties. They designated the persons covered by the contract, outlined the health benefits available under the contract, provided data on the persons covered, detailed the premium and retention rates, and specified the disposition of surplus premiums upon renewal or termination. Without the inclusion of the specifications there would have been several serious gaps in the contract. Of more importance is the fact that both parties looked to the specifications during the period in which the policy was in effect to define their rights and obligations in regard to the disposition of the surplus premiums. On two occasions the Board demanded from Blue Cross credit for the surplus amounts, which amounts totalled $8,000,131.60, and Blue Cross complied. Blue Cross had no obligation to return these funds under the contract. Its sole obligation to return the funds is found in the specifications. When a contract is ambiguous and the parties have by their subsequent conduct placed a construction upon it which is reasonable, that construction will be adopted by the Court. *Fredeking v. Grimmett,* 140 W.Va. 745, 758, 86 S.E.2d 554, 562 (1955). It is clear that the parties intended to be bound by the specifications as a part of the contract, and we, therefore, find that the specifications were part of the agreement between the parties.

## I.

As we read the specifications, Blue Cross was entitled to the surplus only if the Board terminated the contract early.[3]

---

2. It is difficult to see how this contention aids the Board. The only document that addresses the breakdown of the charges or disposition of the surplus is the specifications. There is no provision in the contract standing alone which would compel Blue Cross to return any funds to the Board.

3. Blue Cross argued that its answers to the specifications entitled it to receive the surplus, regardless of whether the policy was terminated on a policy anniversary. Question A states "In the event of the termination of the group policies, would your company make a final accounting of the premiums and claims, and return any surplus to the policy holder?" Answer: "Yes, if the contract is terminated by Blue Cross. No, if the contract is terminated by the Public Employees Insurance Board." Blue Cross asserts that this question unambiguously entitles them to the surplus premium, whether or not the contract was terminated on a policy anniversary. If Question A were taken alone, Blue Cross may have been correct in its assertion. However, Question B, which follows, states: "Is a final accounting contingent upon termination of the policy on the policy anniversary?" Answer: "Yes." If Blue Cross was entitled to keep the surplus regardless of whether the policy was terminated on the policy anniversary, what possible meaning would Question B have? A final accounting would be pointless unless there was a possibility of a refund. At the very least, this raises a serious ambiguity. It is well settled law in West Virginia that insurance contracts are to be strictly construed against the insurance company and in favor of the insured. *See, e.g., Broy v. Inland Mut. Ins. Co.,* 160 W.Va. 138, 141, 233 S.E.2d 131, 133 (1977). Any ambiguities, therefore, will be resolved in favor of the Board.

Therefore, the provision allowing Blue Cross to keep the surplus appears to be either a liquidated damages provision or a penalty clause.[4]

■ While the parties may properly contract for liquidated damages where such damages are not readily ascertainable, when the amount is grossly disproportionate to the actual damages such a clause in a contract is a penalty clause rather than a liquidated damages provision.[5] This is true regardless of what the provision is called in the contract. *Stonebraker v. Zinn*, 169 W.Va. 259, 286 S.E.2d 911, 914 (1982). In West Virginia a penalty clause will not be enforced unless justice clearly demands it. *Hill v. Vencill*, 90 W.Va. 136, 144, 111 S.E. 478, 481 (1922). Before Blue Cross is entitled to the surplus it must first prove that the provision empowering it to keep the surplus is not a penalty clause.[6]

## II.

Another issue before this Court is who terminated the contract. We see three pos-

sibilities: (1) The Board's official notice to Blue Cross on February 28, 1975, terminated the contract effective April 1, 1975; (2) The contract terminated automatically due to the Board's failure to pay the monthly charges as they came due; or (3) Blue Cross terminated the contract by failing to provide insurance coverage during the grace period specified in the contract.

■ Although it would appear at first glance that the Board terminated by giving notice, a closer review indicates that the Board's actions did not cancel the contract on April 1, 1975. West Virginia Code § 5–16–9 (1979) provides that the Board may discontinue a contract at the end of a contract period.[7] No provision is made to empower the Board to discontinue a contract prematurely. An administrative agency, being a creature of statute, has no authority except as conferred by statute. *Eureka Pipeline Co. v. Public Service Comm'n*, 148 W.Va. 674, 682, 137 S.E.2d 200, 204 (1964). The Board attempted to terminate its contract with Blue Cross ef-

---

**4.** It is difficult to see from the record before us what consideration Blue Cross put forward for the retention of the $6,000,000.00 surplus. The gross profit to Blue Cross was figured into the 5.75% retention rate, as was a risk factor in case the incurred charges were not enough to cover the claim. Blue Cross argued in its brief that there was a risk that the incurred claims would exceed the total charges and that the policy would terminate before Blue Cross could raise the charges, and that this risk was the consideration for retention of the surplus. However, Blue Cross admitted in the court below that a "risk charge" was figured into the retention rate because of this possibility:

> MR. MICHAEL: Your Honor, I have an answer for the question of why risk charge is in there. That is an added charge that is part of the retention, which is a charge that is figured in for the company for taking the risk that the cost of paying claims might exceed the premium received. In other words, Blue Cross, Blue Shield and the Board entered into this contract, there was no guaranty there would be any surplus premiums. The Board (sic) could well have been stuck paying out more than the premiums it received, so as part of the retention there is a factor that is figured in which takes into account the risk that Blue Cross, Blue Shield runs that the premiums received might not be enough to cover the claims incurred, so that is why that risk charge is factored into the retention.

Trial transcript at page 45.

**5.** The damage to Blue Cross, by the early termination of the Board appears to be ascertainable, at least in retrospect. During the last contract year, the monthly premium was $2,252,018.37 a month. Therefore, the total premium due for April, May and June of 1975 was $6,756,055.11. This multiplied by 5.75%, the amount of the retention rate, would give us $388,473.17, which would appear to be the amount of gross profit which Blue Cross lost by the State terminating three months early. The $6,066,335.36 which Blue Cross now claims is over fifteen times what appears to be the amount of their damages.

**6.** Because this case was decided in summary judgment, before a complete record could be developed, and because the above was not an issue on which Blue Cross had an opportunity to defend, we refrain from ruling and instead remand this issue to the trial court for further development of the facts and decision in accordance with this opinion.

**7.** The last paragraph of W.Va.Code § 5–16–9 provides:

> The Board may at the end of any contract period discontinue any contract or contracts it has executed with any carrier and replace the same with a contract or contracts with any other carrier or carriers meeting the requirements of this article.

fective April 1, 1975, three months before the end of the contract year. As such, this act was ultra vires and, therefore, void and of no effect. "A state or one of its political subdivisions is not bound by the legally unauthorized acts of its officers; and all persons must take note of the legal limitations upon their power and authority." *Cunningham v. County Court of Wood County*, 148 W.Va. 303, 310, 134 S.E.2d 725, 729 (1964). Therefore, Blue Cross was charged with the knowledge that the Board was powerless to terminate its contract early and could not rely on any action by the Board in attempting that end. We must, therefore, consider the contract as continuing in effect until terminated by some other method.

■ The most obvious possibility is that the contract was terminated automatically due to a failure to pay the charges pursuant to Article XII of the contract, the pertinent part of which is set out below:

> If the Employer fails to pay the charges to Blue Cross Hospital Service, Inc. and Blue Shield of Southern West Virginia, Inc., within 30 days after they become due and payable, this Contract is automatically terminated, and no Subscriber shall be entitled to any benefits hereunder after such 30-day period, but during such grace period this Contract shall continue in force.

Certainly the Board could not enjoy the benefits of a contract while refusing to pay for them and claim that the contract could not be terminated.

However, by the same token, the Board was not forced by statute to pay for insurance if Blue Cross breached the contract by terminating its coverage early. Note in Article XII above that there was a grace period in which Blue Cross had a duty to provide insurance for thirty days after the charge for April was due and payable. Blue Cross, therefore, was required under the terms of the contract to act as an

insurer, or at least hold itself out as an insurer, for thirty days after the April payment to Blue Cross became due and payable. If Blue Cross terminated the insurance one day earlier than the thirty required, then Blue Cross terminated the contract and the Board did not.[8] The answers to the specifications make it clear that if Blue Cross terminated the contract it must return the surplus.

Unfortunately, there is not enough evidence in the record for this Court to determine this issue. We must, therefore, remand to the lower court for further development of the facts and determination consistent with this opinion.

For the reasons herein expressed, the decision of the trial court is reversed and remanded.

Reversed and remanded.

NEELY, Chief Justice, dissenting:

I find that I must dissent to Part II of the majority opinion because the evidence indicates conclusively that the State, and not Blue Cross, cancelled the contract. The "grace period" that is provided in insurance contracts, and that is required by statute, is an "anti-lapse" provision designed to prevent insureds who are late in paying premiums from being without coverage. It has long been the rule in other jurisdictions, both federal and state, that a grace period: "Does not contemplate free insurance, or operate to continue the policy in force after it expires by agreement of the parties." *Miller v. Travelers Ins. Co.*, 143 Pa.Super. 270, 17 A.2d 907, 909 (1941).

Indeed, a grace period, is actually a sale of insurance upon credit. It is a grant of permission to defer payment, and not a gift of insurance. *Interstate Fire Insurance Company v. United States*, 215 F.Supp. 586, 594 (1963). Such clauses are inserted in insurance contracts for the purpose of preventing an immediate lapse upon failure to pay a stipulated premium. Because

---

8. "It may also happen that in the course of performance of a contract, one of the parties may, by word or act, deliberately and avowedly refuse performance on his part. In such case the other party is exonerated from a continued performance of his promise, and is at once entitled to bring action." *Gross v. Lewis & Schmidt*, 54 W.Va. 433, 440, 46 S.E. 174, 177 (1903), *quoting Clark on Contracts*, p. 648 (——).

most insureds do, in fact, renew their policies, there is only a minimal cost in providing a grace period. And, to the extent that insureds take advantage of thirty extra days of coverage without renewing their policies, the cost can be passed on to policyholders as a class. The majority's opinion seems to indicate that a grace period is designed to provide "baker's dozen" insurance. It is not.

In the case before us the State said that it did not want Blue Cross' insurance. In insurance contracts, as in other areas of contractual agreements, the rules of contract apply. *Blue Cross-Blue Shield of Alabama v. Caudle*, 404 So.2d 684, 685 (Ala.Civ.App.1981). Thus, when an insured tells his insurer that he does not want the latter's product, the insurer is under no obligation to continue to provide the product.

Furthermore, I disagree with Syllabus Point 1 except as a general rule applicable in the most extreme cases. Certainly state officials and those contracting with the State may not collude to the public's detriment nor deliberately violate clear legal provisions. Nonetheless, business must be able to contract with the State in roughly the same fashion that it contracts with other, sophisticated commercial parties. It is not the place of vendors to insist upon supplying a service to the State that the State's officers and agents absolutely refuse to accept simply because of the vendors' view of the current state of contract law.

In this context, a private firm that does business with the State is in the same position as an ordinary, innocent citizen who finds himself looking down the barrel of a .357 magnum revolver in the hand of a state trooper who is arresting him. The honest citizen understands that he is the victim of a false arrest, but at the same time he realizes there is something inherently counterproductive about asserting his rights too vociferously and consequently, having his head blown off. To-wit the following limerick:

This is the story of John McGrey,

Who thought he had the right-of-way,

He was right, dead right, as he sped along,

But he's just as dead as if he'd been wrong.

Blue Cross could have parsed the contract at issue here until the cows came home. Blue Cross could have adamantly insisted that it understood the State's interest better than the State's agents. And Blue Cross could have spent hundreds of thousands of dollars in litigation costs to vindicate its eleemosynary impulses. But that is not how any reasonable party in the private sector conducts himself; it is only how some judges' fantasy of the law's favorite creature, the reasonable man, conducts himself. Alas, Blue Cross' agents are but ordinary mortals with a normal instinct for commercial self-preservation. In this case they did everything that reasonably could be expected of them. It is unfortunate that the majority concludes they are culprits instead of victims.