647 S.E.2d 879

**Jerome E. BURCH, Levi Miller, Frank Fitzpatrick, Charles E. Thomas, Richard Fiedler, Robert F. Hurley, and John T. Mitchell, Plaintiffs Below, Appellants**

v.

**NEDPOWER MOUNT STORM, LLC and Shell Windenergy, Inc., Defendants Below, Appellees.**

No. 33201.

Supreme Court of Appeals of West Virginia.

Submitted April 17, 2007.

Decided June 8, 2007.

Dissenting Opinion of Justice Benjamin July 27, 2007.

448

Richard F. Neely, Esq., Neely & Hunter, Charleston, for the Appellants.

Stephen M. LaCagnin, Esq., Andrew M. Wright, Esq., Jackson Kelly PLLC, Morgantown, Christopher L. Callas, Esq., Jackson Kelly PLLC, Charleston, for NedPower Mount Storm LLC.

Samuel M. Brock III, Esq., Grant P.H. Shuman, Esq., Spilman Thomas & Battle, PLLC, Charleston, Reginald R. Smith, Esq. (Pro Hac Vice), L. Joseph Loveland, Esq. (Pro Hac Vice), Jonathan L. Marsh, Esq. (Pro Hac Vice), King & Spalding LLP, Houston, TX, for Shell WindEnergy Inc.

John D. Wooton, Esq., for Amici Curiae Grant County Landowners.

Vincent Trivelli, Esq., The Calwell Practice, PLLC, for Amicus Curiae West Virginia State Building and Construction Trades Council, AFL–CIO.

Dennis DiBenedetto, Esq., Grant County Prosecuting Attorney, for Amici Curiae The County Commission of Grant County, The Board of Education of Grant County, The Grant County Development Authority, The Sheriff of Grant County, and The Assessor of Grant County.

Jeffrey R. Roth, Esq., for Amici Curiae Grant County Landowners/Lessors Jason Kitzmiller, Mark Nichol, Andrew Lee Evans, Linda Evans, Vernon Hanlin, Norma Hanlin, Roy Jones, David Kline, Tim Park, Evelyn Streets, and Roger Whetzel.

MAYNARD, Justice.

The appellants appeal the April 7, 2006, order of the Circuit Court of Grant County that dismissed their nuisance claim in which they sought an injunction against the appellees, NedPower Mount Storm, LLC and Shell WindEnergy, Inc., to enjoin the appellees from constructing a wind power electric generating facility in close proximity to the appellants' property. For the reasons that follow, we reverse the circuit court and remand for proceedings consistent with this opinion.

## I.

### FACTS

By final order dated April 2, 2003, the Public Service Commission ("the PSC") granted NedPower Mount Storm LLC, an appellee herein, a certificate of convenience and necessity [1] to construct and operate a wind power electric generating facility along the Allegheny Front in Grant County.[2] Ned-

---

1. In July 2003, the Legislature changed the nature of the certificate required for the operation of wholesale electric generating facilities, like the wind power facility at issue, from a certificate of public convenience and necessity to a siting certificate. According to W.Va.Code § 24–2–1(c)(1) (2006), a facility granted a certificate of public convenience and necessity issued on or before July 1, 2003, shall be subject to the specified statutory provisions "as if the certificate of public

convenience and necessity for such facility were a siting certificate." In this opinion, we refer to the certificate issued to the appellees as a siting certificate.

2. The PSC's certificate hearing was the subject of public notice and comment. In its final order, the PSC concluded as a matter of law that the facility will be "an economically beneficial, environmentally responsible wind power facility"

Power has entered into a contract with appellee Shell WindEnergy, Inc., to sell the entire facility to Shell upon its completion. It is contemplated that the wind power facility will be located on a site approximately 14 miles long with an average width of one-half mile.[3] The facility is to include up to 200 wind turbines. Each turbine is to be mounted on a steel tower approximately 15 feet in diameter and 210 to 450 feet in height, and have three blades of approximately 115 feet.

The appellants are seven homeowners who live from about one-half mile to two miles from the projected wind turbines.[4] On November 23, 2005, the appellants filed a complaint in the Circuit Court of Grant County seeking to permanently enjoin NedPower and Shell WindEnergy, Inc., from constructing and operating the wind power facility on the basis that it would create a private nuisance. Specifically, the appellants asserted that they will be negatively impacted by noise from the wind turbines; the turbines will create a "flicker" or "strobe" effect when the sun is near the horizon; the turbines will pose a significant danger from broken blades, ice throws, and collapsing towers; and the wind power facility will cause a reduction in the appellants' property values.

The appellees subsequently filed a joint motion for judgment on the pleadings in which they essentially argued that a circuit court has no jurisdiction to enjoin, as a prospective private nuisance, projects authorized by the PSC, and that a private party cannot collaterally attack a final order of the PSC by means of bringing an injunction action in circuit court.

By order of April 7, 2006, the circuit court granted the appellees' motion for judgment on the pleadings and dismissed the appellants' action with prejudice. The circuit court based its ruling on the following grounds: it has no jurisdiction to enjoin the construction of a project that was approved by the PSC; most of the assertions made by the appellants concern activities that constitute a public rather than a private nuisance; a prospective injunction is not a proper remedy in this case because the wind facility is not a nuisance *per se* and does not constitute an impending or imminent danger of certain effect; and the PSC's approval of the facility collaterally estops the appellants from challenging it in circuit court.

The appellants now appeal the circuit court's order. *Amicus Curiae* briefs have been filed with this Court in support of the appellees by the County Commission of Grant County, the Board of Education of Grant County, the Grant County Development Authority, the Sheriff of Grant County, the Assessor of Grant County, Grant County landowners who have leased land to Ned-Power for the construction of the wind power facility, and the West Virginia State Building and Construction Trades Council, AFL–CIO. Grant County landowners who also live in close proximity to the approved site of the wind power facility have filed an *amicus curiae brief* in support of the appellants. We have considered the arguments of *amici* as well as those of the parties in rendering our decision.

## II.

### STANDARD OF REVIEW

▪ This Court has held that "[a]ppellate review of a circuit court's order granting a motion for judgment on the pleadings is de novo." Syllabus Point 1, *Copley v. Mingo County Bd. of Educ.*, 195 W.Va. 480, 466 S.E.2d 139 (1995). When considering the

---

that will help to address the need for "additional generating capacity" and will help "diversify the generation mix by adding a competitive renewable energy source to the regional energy supply." The PSC's final decision was appealed to this Court by Friends of the Allegheny Front, and this Court refused to hear the appeal.

3. The facility is to be located on land leased to NedPower from local and/or out-of-state landowners.

4. The circuit court found that,

The system of approximately 200 wind turbines ... will be approximately 0.5 miles from the house of Plaintiff Jerome Burch, 1 mile from the house of Plaintiff Levi Miller, 0.5 miles from the house of Plaintiff Frank Fitzpatrick, 0.72 miles from the house of Plaintiff Charles E. Thomas, 1.8 miles from the house of Plaintiff Richard Fiedler, 1 mile from the house of Plaintiff Robert Hurley, and 0.8 miles from the house of Plaintiff John T. Mitchell.

propriety of granting a motion for judgment on the pleadings, we are guided by the fact that

> [a] motion for judgment on the pleadings presents a challenge to the legal effect of given facts rather than on proof of the facts themselves. In this respect it is essentially a delayed motion to dismiss. The West Virginia Rules of Civil Procedure approach the motion essentially as a motion to dismiss for failure to state a claim in that the motion will not be granted except when it is apparent that the deficiency could not be cured by an amendment.

Syllabus Point 2, *Copley, supra.* We also keep in mind that a motion to dismiss on the pleadings should only be granted in very limited circumstances. Specifically,

> [a] circuit court, viewing all the facts in a light most favorable to the nonmoving party, may grant a motion for judgment on the pleadings only if it appears beyond doubt that the nonmoving party can prove no set of facts in support of his or her claim or defense.

Syllabus Point 3, *Copley.*

### III.

### DISCUSSION

The appellants raise two assignments of error in this appeal. The first assignment is that the circuit court erred in finding that the siting certificate granted by the PSC to the appellees for the construction of the wind power facility immunizes the appellees from liability under the common law doctrine of nuisance. Second, the appellants allege error in the circuit court's finding that the appellants failed to prove various allegations in their complaint, notwithstanding that on a motion for judgment on the pleadings the well-pled facts of the complaint must be taken as true.

As noted above, in its April 7, 2006, order, the circuit court dismissed the appellants' nuisance claim for an injunction on several independent grounds. This Court will now proceed to consider each of these separate grounds.

#### 1. Jurisdiction

■ The circuit court first found that because the Legislature granted the PSC the power to decide the siting of electric generating facilities that are designated under federal law as exempt wholesale generators, the circuit court lacks jurisdiction to enjoin the construction and operation of these facilities under our law of nuisance.[5]

■ We begin our discussion with the recognition that our common law has always provided a remedy for a nuisance. This Court has explained that

> "nuisance is a flexible area of the law that is adaptable to a wide variety of factual situations." *Sharon Steel Corp. v. City of Fairmont,* 175 W.Va. 479, 483, 334 S.E.2d 616, 621 (1985). In fact, "[i]t has been said that the term 'nuisance' is incapable of an exact and exhaustive definition which will fit all cases, because the controlling facts are seldom alike, and each case stands on its own footing." *Harless v. Workman,* 145 W.Va. 266, 273–74, 114 S.E.2d 548, 552 (1960). Nonetheless, "the term ['nuisance'] is generally 'applied to that class of wrongs which arises from the unreasonable, unwarrantable or unlawful use by a person of his own property and produces such material annoyance, inconvenience, discomfort, or hurt that the law will presume a consequent damage.'" *Harless,* 145 W.Va. at 274, 114 S.E.2d at 552 (citation omitted). Stated another way, "nuisance is the unreasonable, unusual, or unnatural use of one's property so that it substantially impairs the right of another to peacefully enjoy his or her property." 58 Am.Jur.2d *Nuisances* § 2 (2002).

*Booker v. Foose,* 216 W.Va. 727, 730, 613 S.E.2d 94, 97 (2005). In the past, we described a nuisance as

> anything which annoys or disturbs the free use of one's property, or which renders its ordinary use or physical occupation uncomfortable. A nuisance is anything which

---

5. The appellees do not contend, and the circuit court did not find, that federal preemption is applicable under the facts of this case.

interferes with the rights of a citizen, either in person, property, the enjoyment of his property, or his comfort. A condition is a nuisance when it clearly appears that enjoyment of property is materially lessened, and physical comfort of persons in their homes is materially interfered with thereby.

*Martin v. Williams,* 141 W.Va. 595, 610–611, 93 S.E.2d 835, 844 (1956) (citations omitted). More recently, we held that "[a] private nuisance is a substantial and unreasonable interference with the private use and enjoyment of another's land." Syllabus Point 1, *Hendricks v. Stalnaker,* 181 W.Va. 31, 380 S.E.2d 198 (1989). The test to determine unreasonableness has been stated by this Court as follows: "An interference with the private use and enjoyment of another's land is unreasonable when the gravity of the harm outweighs the social value of the activity alleged to cause the harm." Syllabus Point 2, *Hendricks, supra.* With regard to remedying a nuisance, it has long been understood that "[j]urisdiction in equity to abate nuisances is undoubted and of universal recognition." *State v. Ehrlick,* 65 W.Va. 700, 705, 64 S.E. 935, 937 (1909).

In the instant case, the circuit court found that the PSC's power to grant siting certificates to electric generating facilities abrogates a circuit court's jurisdiction to hear a nuisance claim to enjoin the facility's construction. Concerning the PSC's power generally, we have held that, "[t]he Public Service Commission of West Virginia has no inherent jurisdiction, power or authority and can exercise only such jurisdiction, power or authority as is authorized by statute." Syllabus Point 1, *Eureka Pipe Line Co. v. Public Service Com'n,* 148 W.Va. 674, 137 S.E.2d 200 (1964). Therefore, in addressing this issue, we are limited to examining the applicable statutory scheme. Further, in looking at the applicable statutes, our primary focus is whether the Legislature has expressly indicated an intent to abrogate the common law of nuisance. "In determining the meaning of a statute, it will be presumed, in the absence of words therein, specifically indicating the contrary, that the legislature did not intend to innovate upon, unsettle, disregard, alter or violate ... the common law[.]" Syl-

labus Point 27, in part, *Coal & Coke Ry. Co. v. Conley,* 67 W.Va. 129, 67 S.E. 613 (1910). Further, "[o]ne of the axioms of statutory construction is that a statute will be read in context with the common law unless it clearly appears from the statute that the purpose of the statute was to change the common law." Syllabus Point 2, *Smith v. W.Va. State Bd. of Educ.,* 170 W.Va. 593, 295 S.E.2d 680 (1982).

The PSC's jurisdiction, power, and authority are found in W.Va.Code §§ 24–1–1, *et seq.* The Legislative purpose and policy in enacting Chapter 24 of the Code is,

to confer upon the public service commission of this state the authority and duty to enforce and regulate the practices, services and rates of public utilities in order to:

(1) Ensure fair and prompt regulation of public utilities in the interest of the using and consuming public;

(2) Provide the availability of adequate, economical and reliable utility services throughout the state;

(3) Encourage the well-planned development of utility resources in a manner consistent with state needs and in ways consistent with the productive use of the state's energy resources, such as coal;

(4) Ensure that rates and charges for utility services are just, reasonable, applied without unjust discrimination or preference, applied in a manner consistent with the purposes and policies set forth in article two-a [§§ 24–2A–1 et seq.] of this chapter, and based primarily on the costs of providing these services;

(5) Encourage energy conservation and the effective and efficient management of regulated utility enterprises; and

(6) Encourage and support open and competitive marketing of rail carrier services by providing to all rail carriers access to tracks as provided in section three-b [§ 24–3–3b], article three of this chapter. It is the purpose of the Legislature to remove artificial barriers to rail carrier service, stimulate competition, stimulate the free flow of goods and passengers throughout the state and promote the expansion of the tourist industry, thereby

improving the economic condition of the state.

W.Va.Code § 24-1-1(a) (1986). According to W.Va.Code § 24-1-1(b),

> The Legislature creates the public service commission to exercise the legislative powers delegated to it. The public service commission is charged with the responsibility for appraising and balancing the interests of current and future utility service customers, the general interests of the state's economy and the interests of the utilities subject to its jurisdiction in its deliberations and decisions.

The wind power facility at issue is designated under federal law as an exempt wholesale generator.[6] The PSC's jurisdiction over exempt wholesale generators is found in W.Va.Code § 24-2-1(c)(1) (2006),[7] which provides:

> (c) Any other provisions of this chapter to the contrary notwithstanding:

> (1) An owner or operator of an electric generating facility located or to be located in this state that has been designated as an exempt wholesale generator under applicable federal law, or will be so designated prior to commercial operation of the facility, and for which such facility the owner or operator holds a certificate of public convenience and necessity issued by the commission on or before the first day of July, two thousand three, shall be subject to subsections (e), (f), (g), (h), (i) and (j), section eleven-c [§ 24-2-11c] of this article

as if the certificate of public convenience and necessity for such facility were a siting certificate issued under said section and *shall not otherwise be subject to the jurisdiction of the commission or to the provisions of this chapter with respect to such facility except for the making or constructing of a material modification thereof as provided in subdivision (5) of this subsection.* (Emphasis added).

Thus, an exempt wholesale generator of electricity is subject to the jurisdiction of the PSC as specifically indicated in W.Va.Code § 24-2-11c(e) and W.Va.Code §§ 24-2-1(c)(5). According to W.Va.Code § 24-2-11c(e): [8]

> If the commission issues the siting certificate, the commission shall have continuing jurisdiction over the holder of the siting certificate for the limited purposes of: (1) Considering future requests by the holder for modifications of or amendments to the siting certificate; (2) considering and resolving complaints related to the holder's compliance with the material terms and conditions of the commission order issuing the siting certificate, whether or not the complainant was a party to the case in which the siting certificate was issued, which complaints shall be filed, answered, and resolved in accordance with the commission's procedures for resolving formal complaints; and (3) enforcing the material terms and conditions of a commis-

---

6. Exempt wholesale generator status is required to avoid certain restrictions imposed by the Public Utility Holding Act of 1935. The Public Utility Holding Company Act of 2005, Pub.L. 109-58, 119 State. 972, sec. 1262(6), which replaced the 1935 Act, indicates that the term "exempt wholesale generator" has the same meaning as in section 32 of the [the 1935 Act] (15 U.S.C. 79z-5a) as that section existed on the day before the effective date of the Public Utility Holding Company Act of 2005. According to 15 U.S.C. § 79z-5a(a)(1), in part,

> The term "exempt wholesale generator" means any person determined by the Federal Energy Regulatory Commission to be engaged directly, or indirectly through one or more affiliates as defined in section 79(a)(11)(B) of this title, and exclusively in the business of owning or operating, or both owning and operating, all or part of one or more eligible facilities and selling electric energy at wholesale.

7. W.Va.Code § 24-2-1 has been amended since NedPower was granted a siting certificate. However, these amendments do not affect our analysis.

8. W.Va.Code § 24-2-11c(f) concerns the PSC's power to enforce compliance with the material terms of a siting certificate; subsection (g) provides for the right of any person to seek compliance with a siting certificate's material terms; subsection (h) explains that a transferee of a siting certificate must comply with the material terms of the certificate; subsection (i) provides for review by this Court of any person feeling aggrieved by a final order of the PSC; and subsection (j) grants the PSC the power to prescribe rules necessary to carry out the provisions of W.Va.Code § 24-2-11c.

sion order as provided in subsection (f) of this section.

Finally, W.Va.Code § 24–2–1(c)(5) provides,

An owner or operator of an electric generating facility described in this subsection shall, before making or constructing a material modification of the facility that is not within the terms of any certificate of public convenience and necessity or siting certificate previously issued for the facility or an earlier material modification thereof, obtain a siting certificate for the modification from the commission pursuant to the provisions of section eleven-c [§ 24–2–11c] of this article in lieu of a certificate of public convenience and necessity for the modification pursuant to the provisions of section eleven [§ 24–2–11] of this article and, except for the provisions of section eleven-c of this article, shall not otherwise be subject to the jurisdiction of the commission or to the provisions of this chapter with respect to such modification.

Our examination of the express language of the above statutes reveals no specific language indicating the Legislature's intent to disregard or abrogate the common law doctrine of nuisance as it applies to electric generating facilities designated as exempt wholesale generators. Under our rules of construction, because it does not clearly appear to us that the Legislature's purpose was to change the common law of nuisance as it applies to electric generating facilities, we will read the above statutes in context with the common law. Therefore, this Court will presume that the Legislature left intact the circuit court's jurisdiction in equity over electric generating facilities like the one at issue.

Contrary to the arguments of the appellees, we do not believe that a nuisance action to enjoin the construction of an electric generating facility conflicts with the role of the PSC in granting siting certificates to these facilities. The Legislature has charged the PSC with the responsibility for "appraising and balancing the interests of current and future utility service customers, the general interests of the state's economy and the interests of the utilities subject to its jurisdiction in its deliberations and decisions." W.Va.Code § 24–1–1(b). Specific to deciding whether to grant or refuse a siting certificate to an electric generating facility, W.Va.Code § 24–2–11c(c) (2003) provides that "[t]he commission shall appraise and balance the interests of the public, the general interests of the state and local economy, and the interests of the applicant." Notably absent in this balancing of interests are the interests of nearby landowners whose use and enjoyment of their properties may be substantially interfered with by the operation of an electric generating facility. Because the rights of nearby landowners are not a primary consideration in the PSC's siting determinations, we believe it is necessary to preserve the traditional rights of these landowners to seek appropriate remedies in the circuit courts.

■ Accordingly, we now hold that the right of a person under the common law to bring in circuit court a nuisance claim to enjoin the construction and/or operation of an electric generating facility that is designated under federal law as an exempt wholesale generator is not precluded by the fact that the Public Service Commission of West Virginia has granted a siting certificate to the owner or operator of the facility pursuant to W.Va.Code § 24–2–1(c)(1) (2006) and related statutes.

In their brief to this Court, the appellees make several policy arguments which, they say, compel affirming the circuit court's decision. For example, the appellees warn that permitting a party to seek a prospective injunction under the facts of this case is contrary to federal, state, and public policies by rendering the PSC's review procedures meaningless, causing a waste of public and private resources, and discouraging the development of exempt wholesale generator projects. The appellees caution that if circuit courts are permitted to prospectively enjoin the construction of exempt wholesale generators, West Virginia will cease to be a viable location for any of these projects because the financial risks and uncertainties will be too great. These arguments do not persuade us. We believe that such policy considerations are best left to the Legislature and not the courts. The role of the courts is simply to apply our traditional nui-

sance law in the absence of a clear legal reason not to so act.

The appellees also aver that permitting a prospective injunction against an electric generating facility certificated by the PSC is essentially an impermissible collateral attack against a PSC siting decision in which the circuit court can "second guess" the PSC's findings. We reject this contention. A siting decision by the PSC involves a different legal analysis, different considerations, and different facts than a nuisance action for a prospective injunction in circuit court.

Further, the appellees contend that the appellants were afforded a full and fair opportunity to participate in the PSC proceedings and could have asserted every challenge to the granting of a siting certificate that they raised in their nuisance claim in circuit court. Again, we disagree. While the appellants could have intervened in the PSC proceeding and voiced their complaints, the appellants' private rights are not among the primary factors to be considered by the PSC when making siting decisions, nor is it the statutory task of the PSC to apply nuisance law.

Finally, the appellees, in support of their position, cite the case of *Sexton v. Public Service Com'n*, 188 W.Va. 305, 423 S.E.2d 914 (1992). In *Sexton*, the plaintiffs appealed a final order of the PSC that conditionally approved the application of a public service district for a certificate of public convenience and necessity to construct and operate a sewage treatment facility on property owned by the plaintiffs. One of the issues raised by the plaintiffs before this Court was that the proposed location of sewage lagoons constituted a nuisance. In addressing this issue, this Court explained the "[w]hether the construction of the sewage lagoons would constitute a nuisance does not defeat the PSC's jurisdiction to issue a certificate of public convenience and necessity under W.Va.Code, 24-2-11." 188 W.Va. at 309, 423 S.E.2d at 918. Further, "[e]ven if the facility creates a nuisance to the Sextons, this harm is simply an element of just compensation in an eminent domain proceeding." 188 W.Va. at 310, 423 S.E.2d at 919.

Moreover, where a governmental entity lawfully exercises its right to take private property for public use, the affected landowner's remedy is the right to obtain compensation for the property taken. As the United States Supreme Court explained in *Ruckelshaus v. Monsanto Co.*, 467 U.S. [986] at 1016, 104 S.Ct. [2862] at 2880, 81 L.Ed.2d [815] at 841[1984]:

> "Equitable relief is not available to enjoin an alleged taking of private property for a public use, duly authorized by law, when a suit for compensation can be brought against the sovereign subsequent to the taking. *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 697, n. 18, [69 S.Ct. 1457, 1465, n. 18, 93 L.Ed. 1628, 1640 n. 18] (1949)." (Citations omitted; footnote omitted).

Thus, we conclude that the Sextons' claim for damage to their property from the construction of the sewage lagoons is not an issue for the PSC to decide, but rather is a matter that should be addressed in the eminent domain proceeding. 188 W.Va. at 310–11, 423 S.E.2d at 919–20 (citations and footnotes omitted). According to the appellants, *Sexton* requires that if the PSC finds that a project is necessary and convenient under applicable statutory law, and if that finding is not overruled by this Court on direct review, construction of the PSC-certified project may not be prospectively enjoined as a private nuisance.

We do not find *Sexton* dispositive of the present issue. Significantly, *Sexton* involved the actual taking of private property for a public use. In *Sexton*, this Court found that equitable relief was not available to enjoin the taking for a public use but that the private landowners could seek nuisance damages in an eminent domain proceeding. In contrast, the instant case does not involve the taking of private property for a public use. Therefore, the appellants herein, unlike the plaintiffs in *Sexton*, do not have the right to an eminent domain proceeding in which they can also seek nuisance damages.

However, we do find *Sexton* instructive insofar as it indicates that the PSC is not statutorily empowered to decide nuisance damages. Despite the appellees' contention

to the contrary, we believe it is relevant that the PSC has no authority to adjudicate damages caused by nuisance. If neither the PSC nor the circuit court has jurisdiction to abate a private nuisance caused by an electric generating facility, the appellants are left without a remedy for their injuries. Such a result is plainly inconsistent with our historical understandings of equity. Accordingly, we find that the circuit court erred in ruling that it had no jurisdiction to hear the appellants' claim to enjoin an alleged nuisance.

### 2. Private Nuisance Claim for a Prospective Injunction

In addition to finding that it had no jurisdiction to hear the appellants' nuisance claim for an injunction, the circuit court ruled that the appellants failed to set forth sufficient facts in their complaint alleging a private nuisance that would support the granting of a prospective injunction against the appellees. Specifically, the circuit court found that even if the appellants alleged injuries for which remedies are available in nuisance, these alleged injuries do not support a prospective injunction because the injuries are speculative and contingent.

Our reading of the appellants' complaint indicates that the appellants allege, as private nuisances, that the wind turbines will cause constant noise when the wind is blowing and an increase in noise as the wind velocity increases; the turbines will create an eyesore as a result of the turbines' "flicker" or "strobe" effect when the sun is near the horizon; and proximity of the appellants' property to the turbines will result in a diminution in the appellants' property values. We will now determine the legal effect of each of these allegations under our settled law of nuisance.

■■■ First, the appellants allege that the noise from the turbines will constitute a nuisance. This Court has held that "[n]oise alone may create a nuisance, depending on time, locality and degree." Syllabus Point 1, *Ritz v. Woman's Club of Charleston,* 114 W.Va. 675, 173 S.E. 564 (1934). We have further held that "[w]here an unusual and recurring noise is introduced in a residential district, and the noise prevents sleep or otherwise disturbs materially the rest and com-

fort of the residents, the noise may be inhibited by a court of equity." Syllabus Point 2, *Ritz, supra.* *See also Snyder v. Cabell,* 29 W.Va. 48, 1 S.E. 241 (1886) (affirming injunction against skating rink's operation where it was found that noise from the rink materially interfered with the comfort and enjoyment of nearby residents.). These holdings are grounded on a principle that is essential to a civil society which is that "every person … has the right not to be disturbed in his house; he has the right to rest and quiet and not to be materially disturbed in his rest and enjoyment of home by loud noises." *Snyder,* 29 W.Va. at 62, 1 S.E. at 251. Thus, we find that the appellants' allegation of noise is cognizable under our law as an abatable nuisance.

■■■ Second, the appellants allege that a "flicker" or "strobe" effect from the turbines will create an eyesore. Traditionally "courts of equity have hesitated to exercise authority in the abatement of nuisances where the subject matter is objected to by the complainants merely because it is offensive to the sight." *Parkersburg Builders Material Co. v. Barrack,* 118 W.Va. 608, 610, 191 S.E. 368, 369 (1937). This Court has explained in further detail that

> [e]quity should act only where there is presented a situation which is offensive to the view of average persons of the community. And, even where there is a situation which the average person would deem offensive to the sight, such fact alone will not justify interference by a court of equity. The surroundings must be considered. Unsightly things are not to be banned solely on that account. Many of them are necessary in carrying on the proper activities of organized society. But such things should be properly placed, and not so located as to be unduly offensive to neighbors or to the public.

*Barrack,* 118 W.Va. at 613, 191 S.E. at 371. When an unsightly activity is not properly placed, when it is unduly offensive to its neighbors, and when it is accompanied by other interferences to the use and enjoyment of another's property, this Court has shown a willingness to abate the activity as a nui-

sance. For example, in Syllabus Point 3 of *Mahoney v. Walter*, 157 W.Va. 882, 205 S.E.2d 692 (1974), it was held:

> The establishment of an automobile salvage yard with its incident noise, unsightliness, hazards from the presence of flammable materials, open vehicles, rodents and insects, and resultant depreciation of adjoining residential property values in an area which, though unrestricted and containing some commercial businesses, is primarily residential, together with the interference with the use, comfort and enjoyment of the surrounding properties caused by its operation, may be a nuisance and may be abated by a court of competent jurisdiction.

We hold, therefore, that while unsightliness alone rarely justifies interference by a circuit court applying equitable principles, an unsightly activity may be abated when it occurs in a residential area and is accompanied by other nuisances.

 Third, the appellants allege that construction of the wind turbines will cause a reduction in their property values. With regard to the legal effect of mere diminution in the value of property, this Court has explained:

> · Upon the question of reduction in value of the plaintiffs' properties, as the result of the establishment of the used car lot nearby, we find this statement in Wood on Nuisances, 3rd Edition, § 640: "Mere diminution of the value of the property, in consequence of the use to which adjoining premises are devoted, unaccompanied with other ill-results, is *damnum absque injuria*." Also in 66 C.J.S., Nuisances, § 19, P. 771, it is stated that: "However, a use of property which does not create a nuisance cannot be enjoined or a lawful structure abated merely because it renders neighboring property less valuable."

*Martin*, 141 W.Va. at 609–610, 93 S.E.2d at 843–844. However, the appellants in this case do not rely merely upon diminution of property values to support their nuisance claim, but also noise and unsightliness. According to Syllabus Point 1 of *Martin, supra*,

> The establishment of what is commonly known as a "used car lot" with its incident noise, light, unsightliness and resultant depreciation of adjoining residential property values in an area which, though unrestricted and without the corporate limits of a town or city, was across a highway from zoned residential property lying within the corporate limits, and which area had previously been exclusively residential on both sides of the highway for a distance of approximately one-fourth of a mile, and which "used car lot" greatly interferes with the use, comfort and enjoyment of such surrounding residential properties, constitutes a nuisance in fact, and may be abated by a court of equity.

*See also Mahoney, supra* (holding that automobile salvage yard with noise, unsightliness, flammable materials hazards, rodents and insects, and resultant depreciation of adjoining residential property values may be a nuisance and may be abated). We hold, therefore, that an activity that diminishes the value of nearby property and also creates interferences to the use and enjoyment of the nearby property may be abated by a circuit court applying equitable principles. In addition, the landowners may seek compensation for any diminution in the value of their property caused by the nuisance.

 Finally, the remedy sought by the appellants is an injunction against the construction and operation of the wind power facility.

> It is a general rule that when the thing complained of is not a nuisance *per se*, but may or may not become so, according to circumstances, and the injury apprehended is eventual or contingent, equity will not interfere; the presumption being that a person entering into a legitimate business will conduct it in a proper way, so that it will not constitute a nuisance.

Syllabus Point 2, *Chambers v. Cramer*, 49 W.Va. 395, 38 S.E. 691 (1901). We have recognized that a lawful business or a business authorized to be conducted by the government cannot constitute a nuisance *per se*. In the early case of *McGregor v. Camden*, 47 W.Va. 193, 196, 34 S.E. 936, 937 (1899), this Court succinctly stated that "[a] lawful business cannot be a nuisance per se, but from

its surrounding places and circumstances, or the manner in which it is conducted it may become a nuisance." (Citation omitted). *See also, Martin,* 141 W.Va. at 599, 93 S.E.2d at 838 ("The operation of a used car lot is a lawful business, and, as a general rule, it cannot be a nuisance per se."); *Frye v. McCrory Corp.,* 144 W.Va. 123, 129, 107 S.E.2d 378, 382 (1959), *quoting* 66 C.J.S., Nuisances, Section 9 ("The lawful and proper use of property or conduct of business does not ordinarily create an actionable nuisance, and is never a 'nuisance per se' in the strict sense of. that term.").[9] Further, according to Syllabus Point 6 of *Watson v. Fairmont & S. Ry. Co.,* 49 W.Va. 528, 39 S.E. 193 (1901),

When a person or corporation is authorized by the legislature by an express statute to do an act, or by the council of a city or town to which the power to authorize it has been delegated by a legislative act, such person or corporation cannot be regarded as committing a nuisance in the execution of such act nor proceeded against merely upon the theory that it is a nuisance, either at law or in equity.

*See also,* Syllabus Point 1, *Frye, supra* ("The maintaining of a vault under a public sidewalk of a municipality, by authority of law, does not constitute a nuisance per se."). Therefore, when we apply these holdings to the instant facts, we must conclude that, as a lawful business which has been granted a siting certificate by the PSC, the appellees' wind power facility cannot be considered a nuisance *per se.*

 However, the fact that the appellees' electric generating facility does not constitute a nuisance *per se* a does not mean that it cannot be abated as a nuisance. It is also true that a business that is not a nuisance *per se* may still constitute a nuisance in light of the surrounding circumstances. In Syllabus Point 2 of *Mahoney, supra,* this Court held,

As a general rule, a fair test as to whether a business or a particular use of a property in connection with the operation of the business constitutes a nuisance, is

the reasonableness or unreasonableness of the operation or use in relation to the particular locality and under all the existing circumstances.

Specifically, "[t]o sustain a[ ] [prospective] injunction inhibiting ... [a] business, not *per se* constituting a nuisance, it must be shown that the danger of injury from it is impending and imminent, and the effect certain." Syllabus Point 1, in part, *Pope v. Bridgewater Gas Co.,* 52 W.Va. 252, 43 S.E. 87 (1903). With regard to whether an injury in nuisance is certain, this Court has explained that "[m]ere possible, eventual or contingent danger is not enough. That injury will result must be shown beyond question ... not resting on hypothesis or conjecture, but established by conclusive evidence. If the injury be doubtful, eventual, or contingent ... an injunction will not be granted." *Pope,* 52 W.Va. at 256, 43 S.E. at 89 (internal quotation marks and citation omitted). Essentially, the proper test to determine whether a proposed activity should be enjoined on the basis that the activity will constitute a nuisance has been stated as follows: "To warrant the perpetuation of an injunction restraining, as a threatened nuisance, the erection of a building proposed to be used for legitimate purposes, the fact that it will be a nuisance if so used must be made clearly to appear, beyond all ground of fair questioning." Syllabus Point 3, *Chambers, supra.*

 Applying the above law to the allegations in the appellants' complaint, and taking these allegations as true, we conclude that the allegations are legally sufficient to state a claim to prospectively enjoin a nuisance. Stated differently, it does not definitively appear to us that the appellants can prove no set of facts in support of their claim. The appellants have alleged certain injury to the use and enjoyment of their properties as a result of constant loud noise from the wind turbines, the turbines' unsightliness, and reduction in the appellants' property values. If the appellants are able to adduce sufficient evidence to prove these allegations beyond

---

9. The classic example of an unlawful business that constitutes a nuisance *per se* that can be abated by injunction is a brothel. *See State v.* *Navy,* 123 W.Va. 722, 725, 17 S.E.2d 626, 628 (1941) ("A bawdy house is a public nuisance *per se* that may be abated by injunction").

all ground of fair questioning, abatement would be appropriate. Therefore, we find that the circuit court erred in ruling that the appellants failed to assert any facts of a private nuisance that would support a prospective injunction.

The appellees argue, however, that under this Court's holding in *Severt v. Beckley Coals, Inc.*, 153 W.Va. 600, 170 S.E.2d 577 (1969), the appellants do not have a cognizable nuisance claim because they have an adequate remedy at law. In *Severt*, the defendant began a coal mining operation within 120 feet of the plaintiffs' home. The defendant installed an exhaust fan, a crusher, and a belt carrier, and used trucks to transport coal. The defendant's facility was in constant operation from approximately 6:00 a.m. until 2:00 a.m. the following morning, and continued six days a week. The plaintiffs sued the defendant and produced evidence at trial that the defendant's facility deposited large quantities of dust on the plaintiffs' property, and that constant loud noise from the facility disturbed the plaintiffs' peace and disrupted their sleep. The plaintiffs also produced evidence of a reduction in the value of their property. The jury awarded the plaintiffs for damages to real estate and personal injury, but the circuit court refused the plaintiffs' request for injunctive relief to prevent the defendant from operating its coal mining facility.

■ This Court affirmed the circuit court's denial of injunctive relief. In Syllabus Point 3 of *Severt*, the Court held that "[e]quity does not have jurisdiction of a case in which the plaintiff has a full, complete and adequate remedy at law, unless some peculiar feature of the case comes within the province of a court of equity." The Court explained that "[i]t clearly appears from the evidence disclosed by the record that the plaintiffs have an adequate remedy at law for the recovery of damages to compensate them fully for the injuries and damages caused by the defendant." *Severt*, 153 W.Va. at 606, 170 S.E.2d at 581.

■ After careful consideration of the reasoning in *Severt*, we do not find *Severt* to be governing precedent. Frankly, *Severt* is inconsistent with this Court's line of nuisance cases which clearly hold that continual substantial interferences with a person's use and enjoyment of property by things such as noise and unsightliness can best be abated by courts applying equitable principles. This is due to the fact that constant loud noise and unsightliness that interferes with the use and enjoyment of property simply are not susceptible to computation. Thus, money damages alone are an insufficient remedy. Moreover, the fact that the appellants may have an adequate legal remedy for reduction in property values does not bar equity claims to abate other alleged nuisances. This Court held in Syllabus Point 1, *Lyons v. Viglianco*, 122 W.Va. 257, 8 S.E.2d 801 (1940), that " '[c]ourts of equity exercise a very salutary jurisdiction in matters of nuisances.' *Moundsville v. Ohio River Rr. Co.*, 37 W.Va. 92, 105-6, 16 S.E. 514, 20 L.R.A. 161. Where equity jurisdiction is rightfully invoked in such a matter, the enforcement also of a legal demand is ancillary." Thus, for these reasons, we decline to apply *Severt* to the instant case.

### 3. Collateral Estoppel

■ Last, the circuit court ruled that even if the appellants could assert facts sufficient to allege a nuisance claim for a prospective injunction and the circuit court had jurisdiction to hear it, the appellants are collaterally estopped from bringing such a claim.

■ Under our law,

Collateral estoppel will bar a claim if four conditions are met: (1) The issue previously decided is identical to the one presented in the action in question; (2) there is a final adjudication on the merits of the prior action; (3) the party against whom the doctrine is invoked was a party or in privity with a party to a prior action; and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.

Syllabus Point 1, *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995). We find that collateral estoppel does not bar the appellants from bringing a nuisance claim for a prospective injunction in circuit court because the

issues previously decided by the PSC in granting the appellees a siting certificate are not identical to the issues in a nuisance claim.

The PSC, in determining the propriety of constructing and operating the wind power facility, was charged with appraising and balancing the interests of the public, the general interests of the state and local economy, and the interests of the applicant. The issue in a nuisance claim, however, is whether an interference with the private use and enjoyment of another's land is unreasonable, *i.e.*, whether the gravity of the harm outweighs the social value of the activity alleged to cause the harm. The PSC did not specifically decide the issue of whether the social utility of the wind power facility outweighs any interference with the appellants' private use and enjoyment of their properties. Accordingly, we find that the circuit court erred in ruling that the appellants' nuisance claims are barred by collateral estoppel.[10]

█ Finally, prior to closing, we wish to emphasize several important points. First, in considering the appellants' claim for a permanent injunction, the circuit court has great latitude in fashioning an appropriate remedy. Certainly, the court has the power to completely enjoin the construction of the wind power facility. The circuit court may also fashion an equitable remedy short of a complete injunction. We have held that "[i]n the matter of a private nuisance, the relief granted should be such as to cause the defendant no more injury than is necessary to protect the plaintiff's rights." Syllabus Point 2, *Lyons, supra*. Second, although the PSC's grant of a siting certificate to the appellees does not abrogate the circuit

court's jurisdiction to hear the appellants' claim, the siting certificate is persuasive evidence of the reasonableness and social utility of the appellees' use of the property to operate a wind power facility. Finally, our decision in this case is merely that the appellants have alleged sufficient facts in their complaint to avoid a dismissal on the pleadings. In other words, the appellants should have their day in court. Beyond this, we offer no opinion on the ultimate success or failure of the appellants' claim.[11]

### III.

### CONCLUSION

In conclusion, having found no basis in law for the circuit court's ruling that dismissed on the pleadings the appellants' nuisance claim for an injunction, we reverse the April 7, 2006, order of the Circuit Court of Grant County, and we remand this case to the circuit court for proceedings consistent with this opinion.

Reversed and remanded.

BENJAMIN, Justice, dissenting.

(Filed July 27, 2007)

The appellant landowners conceded, and the Court apparently agreed, that if appellee NedPower[1] were a public utility with the power of eminent domain, they could not have the construction and operation of its wind-turbine facilities enjoined as a private nuisance. Rather, they would be limited to a claim for money damages in an eminent domain or inverse condemnation proceeding[2]

10. Because we find that the first condition of a collateral estoppel bar is not present, we need not consider the remaining conditions.

11. The appellees also argue that the judgment of the circuit court must be affirmed because the appellants failed to assign error to and brief all of the grounds enumerated by the circuit court for granting judgment on the pleadings. We disagree. We believe there are sufficient arguments in the appellants' brief to challenge all of the circuit court's grounds for its dismissal on the pleadings.

1. NedPower has been deemed to be an "exempt wholesale generator" (EWG), which, according to the P.S.C.'s order of April 2, 2003, is a status

NedPower sought and received from the Federal Energy Regulatory Commission (FERC).

2. Recently, this Court recognized the distinction between condemnation and inverse condemnation proceedings, noting that:

The United States Supreme Court drew the following distinction between "inverse condemnation" and condemnation proceedings in *U.S. v. Clarke*, 445 U.S. 253, 100 S.Ct., 1127, 63 L.Ed.2d 373 (1980).
[A] landowner's action to recover just compensation for a taking by physical intrusion has come to be referred to as "inverse" or "reverse" condemnation ... [A] "condemnation" proceeding is commonly understood to

for noise, unsightliness, and any diminution in the value of their property caused by the facilities.[3]

The explicit or implicit assumptions of the appellants and apparently of the Majority in this appeal is that: (1) NedPower must be subject to the full range of regulation by the PSC as provided in Chapter 24 of the West Virginia Code with respect to its rates and practices in order to be classified as a "real" public utility; and (2) that only such "real" public utilities have the power of eminent domain under W. Va.Code § 54–1–2(a)(2)(2006).[4] In my opinion, both of these premises are incorrect.

### A. *NedPower is a Public Utility*

The appellees describe NedPower time and again as being an "EWG" and its PSC certificated wind-powered electric generating facilities as being an "EWG project."[5]

---

be an action brought *by* a condemning authority such as the Government in the exercise of its power of eminent domain.
*Id.* at 255, 100 S.Ct. at 1129.
*West Virginia Department of Transportation v. Dodson Mobile Homes Sales and Services, Inc.,* 218 W.Va. 121, 123, n. 2, 624 S.E.2d 468, 470, n. 2, (2005).

3. In their briefs before this Court, the appellants represented that "[t]he sole issue on this appeal is whether a siting certificate from the Public Service Commission [PSC] forecloses a circuit court from considering whether a proposed industrial wind facility is a *private* nuisance when the wind facility is **NOT** a regulated public utility and has no power to condemn property." (Emphasis in original). In support of this argument, appellants maintained that "[t]he wind-generated power in this case is *not* part of any regulated public utility" and claimed that orders of the PSC make it clear "that wind turbine facilities are *not* regulated public utilities" because Ned-Power, upon request, was granted a waiver by the PSC relieving NedPower of its obligation to file certain financial and cost-of-service information in support of its application for a certificate of convenience and necessity. (Emphasis in original). Appellants conceded that "a landowner cannot enjoin a *real* public utility [apparently meaning a public utility that is subject to the full range of regulation by the PSC under the provisions of Chapter 24 of the W. Va.Code with respect to its rates and practices] because [such] utility can condemn" and acknowledged this Court's decision in *Sexton v. Public Service Commission,* 188 W.Va. 305, 423 S.E.2d 914 (1992), noting that when the PSC is regulating a *"real* public utility", all related nuisance damages must be sought through an eminent domain proceeding or a damage suit in circuit court. (Emphasis in original). In their Reply Brief, Appellants argued that "[i]n *Sexton,* the reason that the circuit court could *not* award an injunction was *not* the exclusive jurisdiction of the PSC, but rather the fact that the offending sewer treatment plant was a *public utility* with the right of condemnation!" (Emphasis in original).
Unfortunately, the Majority opinion is not as clear as it could and should have been regarding appellant's representations and concessions as to the impact of a determination that NedPower is a regulated or a "real" public utility with the pow-

er of eminent domain. That the Court agreed with the appellants' representations and concessions is perhaps best indicated by its statements that "[i]n *Sexton,* this Court found that equitable relief was not available to enjoin the taking for a public use but that the private landowners could seek nuisance damages in an eminent domain proceeding. In contrast, the instant case does not involve the taking of private property for public use. Therefore, the appellants herein, unlike the plaintiffs in *Sexton,* do not have the right of eminent domain proceeding in which they can also seek nuisance damages." Majority opinion, p. 890. This statement by the Majority is confusing. If the Majority means that this is not a condemnation case, it is correct; on the other hand, if it means that the wind turbines are for private use, I disagree for the reasons explained herein.

4. W. Va.Code § 54–1–2(a)(2) (2006) provides, "The public uses for which private property may be taken or damaged are as follows: ... (2) For the construction and maintenance of telegraph, telephone, electric light, heat and power plants, systems, lines transmission lines, conduits, stations (including branch, spur and service lines), when for public use[.]" This provision was previously codified at W. Va. § 54–1–2(b) (1979) but was redesignated as W. Va.Code § 54–1–2(a)(2) in 2006 without textual amendment.

5. As noted in footnote 1, *supra,* the PSC's April 2, 2003, order determined that NedPower had sought and received from the FERC the status of an EWG. In paragraphs 5 and 6 of its August 8, 2002, application to the PSC for a certificate of public convenience and necessity to construct and operate up to 200 wind-turbine generators, NedPower made the following representations:

5. Applicant will own and operate the Project as an exempt wholesale generator as defined in Section 32(a) of the Public Utility Holding Company Act of 1935. 15 U.S.C. § 79a, *et seq.* As an EWG, Applicant will be engaged directly and exclusively in the business of owning and operating the Project and selling the electric energy generated by the Project at wholesale. Applicant's application for EWG status was filed on June 2, 2002 and was approved by the Federal Energy Regulatory Commission

EWG, the first letters of "exempt wholesale generator," is derived from the Energy Policy Act adopted by Congress in 1992. According to *National Association of Regulatory Utility Commissioners v. Securities & Exchange Commission*, 63 F.3d 1123 (D.C.Cir.1995), the Energy Policy Act's

> purpose was to encourage "stead[y] increases [in] U.S. energy security in cost effective ... ways" by "us[ing] the market rather than government regulation wherever possible both to advance energy security goals and to protect consumers." In order to facilitate the development of a competitive market for wholesale electric power, Congress amended the [Public Utility Holding Company Act of 1935] to make it easier for holding companies to invest in an "exempt wholesale generator" or "*EWG,*" *which is defined as*
>
>> *any person ... exclusively in the business of owning or operating ... all or part of one or more eligible facilities and selling electric energy at wholesale.*
>
> An "*eligible facility*" *is in turn defined to mean a facility that is either "used for the generation of electric energy exclusively for sale at wholesale, or ... used for the generation of electric energy and leased to one or more public utility companies* ...." Because Congress viewed the [Public Utility Holding Company Act's] limitations on corporate structures as "stifling [to] the growth of independent power," the 1992 amendments exempted EWGs "from all provisions of [the Public Utility Holding Company Act]." The amendments also ease the restrictions on companies that wish to invest in EWGs.

*National Assoc. of Reg. Commr's*, 63 F.3d at 1125 (internal citations omitted) (emphasis added.)

This is not the first time that an EWG has been before the Court, yet neither parties nor the Court made any reference to the earlier case, that of *Affiliated Construction*

*Trades Foundation v. Public Service Commission of West Virginia*, 211 W.Va. 315, 565 S.E.2d 778 (2002). While there are a number of facets to that case, the most significant holding of the majority for purposes of this case was that Big Sandy, the corporation at issue therein, was, a public utility despite the fact that the PSC had decided that it was not. Big Sandy, like NedPower, intended to generate electricity solely for the wholesale market. The majority in *Affiliated Trades* disagreed with the PSC's and Big Sandy's contentions that Big Sandy was not a public utility, stating:

> Big Sandy has represented that it will produce electricity which which will be transmitted to AEP for eventual sale to the public. West Virginia Code § 24–2–1 specifically states that one engaged in the generation of electric power is subject to PSC jurisdiction, whether the service is provided "directly or through a distributing utility." We note also that any entity "engaged in any business, whether herein enumerated or not, which is, or or shall hereafter be held to be, a public service" constitutes a public utility under West Virginia Code § 24–1–2, as quoted above. That is an inclusive definition. *We conclude that electric generation and transmission facilities intended solely for the sale of electricity on the wholesale market are within the statutory definition of a public utility set forth in West Virginia Code § 24–2–1 whenever it appears that the electricity produced will, in the course of distribution, ultimately be sold to the public. Accordingly, we find that the PSC determination that Big Sandy is not a "public utility" was erroneous as a matter of law.*

*Affiliated Trades*, 211 W.Va. at 322, 565 S.E.2d at 785 (footnote omitted) (emphasis added).

To the majority in *Affiliated Trades*, if the electricity generated by a facility will ulti-

---

("FERC") on July 23, 2002. The letter approving Applicant's application is attached as exhibit 2.

6. Upon commercial operation, Applicant will use the Project to generate electric energy exclusively for sale at wholesale in the competitive wholesale market. Applicant will make no

retail sales of electric energy from the Project, including without limitation sales to industrial or commercial customers, unless and until such sales are (i) permitted under West Virginia law and the Commission's rules and regulations; and (ii) permitted for EWGs under federal law.

mately be sold to the public, the facility is a public utility. It was of no consequence to the majority that the "public" may be situate entirely out of State. Furthermore, the extent of the PSC's regulation of the facility did not enter into the Court's decision.

Thus, by operation of the *Affiliated Trades* case, upon receipt of its certificate of convenience and necessity from the PSC on April 2, 2003, NedPower became a public utility subject to the full jurisdiction of the PSC to regulate its service, practices and rates under the provisions of Chapter 24 of the West Virginia Code.

Some three months after the PSC order, specifically on July 1, 2003, legislation was enacted, which, in amending W. Va.Code § 24–2–1, converted NedPower's certificate of convenience and necessity (issued by the PSC on April 2, 2003), into a siting certificate for its EWGs and declared in effect, insofar as here relevant, that except for certain delineated continuing jurisdiction of the PSC over the certificate issued to it, NedPower's wind-power-driven electric generators would not "be subject to the jurisdiction of the [PSC] or to the provisions of [Chapter 24 of the West Virginia Code] with respect to such facilit[ies] except for the making or constructing of a material modification thereof as provided in subdivision (5) of this subsection [ (c) of W. Va.Code 24–2–1]." *See* W. Va.Code 24–2–1(c)(1). Thus, according to the 2003 legislation, specifically W. Va.Code § 24–2–1(c)(1) and (2), and W. Va.Code § 24–2–11c(e), (f) and (h), an EWG is subject to the PSC's jurisdiction and regulation with respect to the siting of its electric generating facilities, the making or constructing of a material modification thereof after the siting has been certificated, and considering and resolving complaints relating to compliance with, and the enforcing of, the material terms and conditions of the PSC order issuing the siting certificate.

Significantly, the 2003 legislation did not nullify the majority's holding in *Affiliated Trades* that an EWG is a public utility, and, in my opinion, it did not implicitly do so. Rather, the legislation simply lessened the PSC's authority to regulate an EWG under the provisions of Chapter 24 of the West Virginia Code. Whether an entity such as NedPower, an EWG, is or is not a public

utility is not determined by the extent of the PSC's statutory authority to regulate it, but rather, as the Court held in *Affiliated Trades,* whether its sale of electricity in the wholesale market will, in the course of distribution, ultimately be sold to the public, regardless of where that public may be located.

It is therefore my opinion that NedPower is a public utility herein even though the Majority and the parties assumed that it is not.

B. *NedPower Has the Power of Eminent Domain Irrespective of Whether It is or Is Not a Public Utility Fully Regulated by the P.S.C.*

The parties not only assumed that NedPower is not a public utility, but further assumed that only a public utility which is fully regulated by the PSC (a "real" public utility as the appellants put it) has the power of eminent domain. In other words, the parties linked the power of eminent domain of an electric power generator to PSC regulation. It is not clear that this assumption is correct.

West Virginia Code § 54–1–2(a)(2) declares, in part, that "[t]he public uses for which private property may be taken or damaged are as follows:...For the construction and maintenance of...electric light, heat, and power plants, systems, lines, transmission lines, conduits, stations ... when for public use." These words are indifferent as to how the electric power plant is driven, whether by coal, natural gas, water or wind. In my view, a wind-driven electric power plant is an "electric ... power plant[ ]" under the provisions of W. Va.Code § 54–1–2(a)(2), and eminent domain may be employed in the construction and maintenance thereof if the plant is "for public use." An electric power plant may be "for public use" irrespective of the extent of its regulation by the PSC as indicated above. The majority in *Affiliated Trades* declared that Big Sandy was a public utility not because of the extent of its regulation by the PSC, but because it generates electricity for ultimate sale to the public. In *Preston County Light & Power Co. v. Renick,* 145 W.Va. 115, 126, 113 S.E.2d 378, 385 (1960), this Court stated that "[t]he term 'public utility' properly designates the owner or person in control of property devoted to the public use[.]" As NedPower's wind-driv-

en generators are ultimately for "for public use," NedPower is a public utility.

That "public use," as that term is used in W. Va.Code § 54–1–2(a)(2), is not linked to the extent of regulation by the PSC of the electric power generators is evidenced by the fact that the Legislature bestowed the power of eminent domain upon "electric power ... companies, when for public use" in 1907, well before the Legislature created the PSC in 1913. The constitutionality of the 1907 legislation was upheld in *Pittsburg Hydro–Electric Co. v. Liston,* 70 W.Va. 83, 73 S.E. 86 (1911).

Accordingly, I am of the opinion that Ned-Power, with respect to its EWGs, possesses the power of eminent domain. The Court should, therefore, have denied the relief sought by the appellant landowners because, as the appellants conceded, if NedPower were a public utility with the power of eminent domain they could not enjoin the construction and operation of its wind turbines as a private nuisance. Accordingly, I dissent.